CONTINENTAL CASUALTY COMPANY, Plaintiff and Counterdefendant-Appellee, v. ROPER CORPORATION, Defendant and Counterplaintiff-Appellant.

First District (1st Division)  No. 87—3239

Opinion filed August 8, 1988.

Jay A. Canel, P.C., of Chicago (Jay A. Canel and Peter M. King, of counsel), for appellant.

Haskell & Perrin, of Chicago (James Kirk Perrin and Marsha Kay Ross, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

This appeal is predicated upon an umbrella excess third-party liability policy (the policy) issued by plaintiff-counterdefendant, Continental Casualty Company, to defendant-counterplaintiff, Roper Corporation. Roper appeals from three orders entered by the trial court: (1) the April 23, 1987, order holding that coverage A of the policy, not coverage B, applied to the claims at issue; (2) the June 23, 1987, order allowing Continental to file its affirmative defense in response to Roper's second amended counterclaim; and (3) the September 15, 1987, order denying the relief requested by Roper in its second amended counterclaim. On appeal, Roper contends that the trial court erred in entering each of the above orders. For the following reasons, we affirm the judgments of the trial court.

The Policy issued by Continental to Roper contained two coverage provisions relevant to this appeal:

"1. COVERAGE A—EXCESS LIABILITY INDEMNITY

The company will indemnify the insured for loss in excess of the total applicable limits of liability of underlying insurance stated in the schedule. The provisions of the immediate underlying policy are, with respect to Coverage A, incorporated as a part of this policy except for any obligation to investigate and defend and pay for costs and expenses ***."

"2. COVERAGE B—EXCESS LIABILITY INDEMNITY OVER RETAINED LIMIT.

The company will indemnify the insured, with respect to any occurrence not covered by underlying insurance, or with respect to damages not covered by underlying insurance but which results

from an occurrence covered by underlying insurance, for ultimate net loss in excess of the insured's retained limit which the insured shall become obligated to pay as damages by reason of liability imposed upon the insured by law or assumed by the insured under any contract because of personal injury, property damage, or advertising injury to which this coverage applies, caused by an occurrence * * *."

Pursuant to the underlying insurance policy issued to Roper by Columbia Casualty Company, Columbia's limits of liability were $950,000 per occurrence with a $1 million annual aggregate in excess of Roper's self-insured retention of $50,000 per lawsuit. On June 12, 1981, Columbia notified Roper that the policy limits had been reached for claims that arose during the 1975-76 policy year. At that time, 15 lawsuits filed against Roper which would have been covered by Columbia's policy had not the policy limits been reached remained pending. With the exception of two of the pending lawsuits, Mt. Eden and Webster, Continental indemnified Roper for settlement and verdict amounts in excess of Roper's $50,000 per occurrence self-insured retention. The Mt. Eden claim is the subject of a separate action. The Webster claim is the subject of Roper's second amended counterclaim and is at issue on this appeal.

With respect to the Webster claim, the cause of action accrued in March 1975 and a lawsuit was filed against Roper in 1980. As previously stated, because Columbia's policy limits had been exhausted for claims arising in the 1975-76 policy period, Roper sought indemnification from Continental. On April 8, 1982, Webster made a settlement demand of $500,000 to Roper. Roper notified Continental, which responded that it would contribute $50,000 to settlement, contingent upon Roper's payment of its self-insured retention of $50,000. The case was tried on April 12-15, 1982, and a verdict was entered against Roper and Sears for $76,000. Roper appealed on the issue of liability only.

On April 29, 1982, Continental filed a declaratory judgment action seeking a determination that under coverage A of the Policy, Continental had no obligation to defend Roper or to pay for Roper's defense and that Roper was not entitled to apply any amount it expended for its own defense against its per occurrence self-insured retention. On May 19, 1982, Continental informed Roper that if it pursued the Webster appeal, it would accept maximum liability of only $25,000 based on its obligations pursuant to the verdict of $76,000. On June 18, 1982, Roper rejected Continental's position. Shortly thereafter, on July 9, 1982, Roper offered Webster $20,000 to settle. Webster rejected the offer

and counteroffered to settle at $70,000. In a letter dated November 9, 1982, Continental requested Roper to immediately negotiate a settlement within its $50,000 self-insured retention and Continental would accept liability for the additional $20,000. Roper replied that its attorneys had advised that Roper had a substantial likelihood of prevailing on appeal and it was going to pursue the appeal.

Oral argument in the Webster appeal took place on April 4, 1983. The cause was then remanded for a new trial on the issue of liability only. On Webster's motion, the order was modified and a new trial was ordered on the issues of liability and damages. On March 1, 1984, Continental again asked Roper to settle the case within Roper's $50,000 self-insured retention or to send the $50,000 to Continental and it would settle the case. Again, Continental limited its settlement contribution to $20,000. Roper rejected Continental's demand and a few days later, Webster's settlement offer increased to $183,000.

On March 12-15, 1984, retrial of the Webster case took place, resulting in a verdict of $214,000 against Roper and Sears. Approximately two weeks later, Roper offered its $50,000 self-insured retention amount to Continental for settlement and informed Continental that it intended to appeal. On May 13, 1985, the judgment was affirmed on appeal. Roper then demanded that Continental issue a check to its attorneys in the amount of $214,000 plus post-judgment interest. In response, Continental tendered a check to Roper in the amount of $20,000, stating that it was Continental's position that Roper had "improperly placed Continental Casualty at risk to a larger exposure by its decision to try this case [and] *** Roper [should] *** bear responsibility for the remainder of the judgment [sic] since the case [was] tried over [Continental's] strenuous objections." Roper rejected tender of the check and claimed that Continental had had the obligation and the opportunity to settle the case for $70,000. Continental again tendered the $20,000 check with the understanding that acceptance of the check would not be construed as a waiver of any of Roper's rights to proceed against Continental for the entire judgment. Roper then cashed Continental's check.

On October 15, 1986, Roper filed a second amended counterclaim in the declaratory judgment action, claiming that coverage B of the Policy governed Continental's obligations to Roper. Trial commenced on February 4, 1987, at which time the court heard arguments as to whether coverage A or coverage B applied. At the outset, the court queried counsel for Continental and Roper as to whether it would be more efficient to first decide whether coverage A or coverage B applied and then decide whether Continental had breached the Policy with respect

to indemnification and defense of the Webster claim. Counsel agreed. Thereafter, in a memorandum of opinion issued on April 2, 1987, the trial court held that coverage A applied and that coverage B did not provide any indemnity to Roper. Roper filed a motion to reconsider, and the court reaffirmed its original decision in an order dated April 23, 1987. No decision was made as to whether Continental had satisfied its coverage A obligations to Roper with respect to the Webster claim.

Subsequently, on May 14, 1987, Continental moved for leave to file an affirmative defense to Roper's second amended counterclaim. Following a hearing on the motion, the court granted Continental leave to file its affirmative defense and gave Roper 60 days to conduct discovery and 21 days to respond. As its affirmative defense, Continental alleged that pursuant to the provisions of Columbia's underlying policy, which are incorporated into coverage A of the Policy, Continental had satisfied its obligations with respect to the Webster claim by tendering an amount to Roper to effectuate the settlement.

On September 14, 1987, trial commenced on Roper's counterclaim. The trial court held in favor of Continental on its affirmative defense, holding that Continental had discharged its obligation to Roper regarding Webster. Roper's timely appeal followed.

On appeal, Roper initially contends that the trial court erred in holding that coverage A, not coverage B, applied when the coverage limits of Columbia's underlying policy were exhausted for a specific policy period. Roper argues that both coverage A and coverage B apply to that particular situation. According to Roper, coverage A provides excess insurance for actions covered by an underlying policy and coverage B insures actions not covered by an underlying policy or actions which would have been covered by an underlying policy but for the exhaustion of the underlying policy's limits. Thus, Roper contends, because the Webster claim would have been paid by Columbia but for the fact Columbia's policy limits had been exhausted, coverage B applies.

In response, Continental argues that coverage A and coverage B are mutually exclusive. Coverage A is excess coverage which picks up indemnity obligations at the point when the underlying primary coverage is exhausted. Coverage A does not provide for defense costs or investigation costs. By comparison, coverage B is limited primary coverage for risks not covered by underlying insurance or for damages not covered by underlying insurance. Continental explained that an example of the latter situation is when punitive damages are sought for an occurrence which is covered by the primary underlying policy If the primary policy does not pay punitive damages, coverage B would pay those damages.

In addressing the issue as to which coverage applied, the trial court focused on the meaning of the phrase "not covered by underlying insurance" as used in the coverage B provision and concluded that the word "coverage" means the sum of risks that an insurance policy covers. Thus, because the risk involved in the Webster claim and the type of damages sought were assumed by the underlying Columbia policy, coverage A of the Policy applied when Columbia's coverage was exhausted. In reaching its conclusion, the trial court relied on *Seabaugh v. Sisk* (Mo. App. 1967), 413 S.W.2d 602, and *Garmany v. Mission Insurance Co.* (11th Cir. 1986), 785 F.2d 941.

In *Seabaugh*, plaintiff was injured and her husband killed when the automobile which her husband was driving collided with that driven by decedent tortfeasor. The sole issue on appeal was the applicability of the uninsured motorist provision in plaintiff's husband's automobile insurance policy to a situation where the tortfeasor's insurer went into receivership and was unable to defend or to pay the claim. The provision defined "an 'uninsured automobile' as '(a) an automobile or trailer with respect to the ownership, maintenance or use of which there is, in at least the amounts specified by the financial responsibility law of the state ***, no *** policy applicable at the time of the accident ***, or with respect to which there is a bodily injury liability bond or insurance policy applicable at the time of the accident but the company writing the same denies coverage thereunder ***.' " *Seabaugh*, 413 S.W.2d at 604.

In resolving the issue, the *Seabaugh* court focused on the phrase "denied coverage" as it was used in the policy. Initially, the court noted that both the verb "to deny" and the noun "coverage" were frequently used and would thus be accorded their plain and ordinary meaning. The court then defined "to deny" as " 'to refuse to grant; to withhold,' " and stated that " 'coverage' ordinarily refers to the risks or hazards assumed by the insurer and covered by the policy." (413 S.W.2d at 606.) Applying these definitions to the facts, the *Seabaugh* court noted that the tortfeasor's insurer had not denied coverage for any reason other than that it had become insolvent and had been placed in receivership. Accordingly, the court concluded that the insurer's insolvency and its failure to defend could not be construed as a denial of liability or coverage.

In *Garmany*, plaintiffs were insured when their automobile was struck by an automobile being test-driven by a potential car buyer. The test driver was insured under the dealership's primary insurance policy for a maximum of $20,000. Judgment was entered in favor of plaintiffs for $542,809.50. The primary insurer paid $20,000. Plaintiffs then

brought suit against Mission Insurance Company, the dealership's excess insurance carrier, to recover the balance of their judgments. Mission claimed that pursuant to the terms of its policy with the dealership, its liability commenced at the threshhold point of $500,000. Thus, its liability was limited to $42,809.50. The *Garmany* court reviewed the language of the policy and concluded that the terms of the policy unambiguously stated that the threshhold point of Mission's liability was $500,000.

Plaintiffs argued that Mission was liable for damages under its excess policy for occurrences "not covered by said underlying insurances" on the ground that because the test driver was insured for only $20,000 under the primary policy, he was, in effect, "not covered" by the policy for anything in excess of that amount. The *Garmany* court again looked to the language of Mission's policy and concluded that the language of the policy did not support plaintiffs' proposed construction. In reaching this conclusion, the *Garmany* court stated that, " 'Not covered by said underlying insurances,' as that phrase is understood in normal usage, speaks only to the *fact* of coverage under the underlying policy, not to the *extent* of coverage under that policy." (Emphasis in original.) (*Garmany*, 785 F.2d at 947.) Therefore, because the policy had provided coverage to the test driver, *albeit* a minimal amount, it could not be held that the test driver had not been covered.

In the present case, Roper argues that *Seabaugh* and *Garmany* are factually distinguishable and that the trial court failed to look to the terms of the Policy at issue and to focus on the specific language of the Policy which, if nothing else, raises an ambiguity. The specific language of the coverage B provision which is pertinent to this issue states:

> "The company will indemnify the insured, with respect to any occurrence not covered by underlying insurance, or with respect to damages not covered by underlying insurance but which results from an occurrence covered by underlying insurance ***."

The trial court disagreed with Roper and accepted Continental's position that the words "coverage" or "covered" refer to risks assumed, not ability to pay. Thus, the "risks" assumed by Continental under coverage B are either the risk that a certain occurrence will take place which was not covered by the underlying insurer, or the risk that a certain type of damage will be awarded which type of damage was not covered by the underlying insurer. In the present case, the trial court found that both the type of occurrence risk and the type of damage risk had been assumed by the underlying insurer, and, thus, were "covered" even though payment was not made because the underlying

insurer's policy limits had been reached.

■■ We agree with the trial court's conclusion and find that the phrase "not covered" as it appears in the coverage B provision of the Policy refers to the fact of coverage, not to the extent of coverage. Thus, in those circumstances, such as in Webster, where Columbia's underlying policy has assumed the risk of the occurrence and the risk of the damages at issue, coverage exists. When the extent of underlying coverage is exhausted, coverage A, as an excess policy, picks up the liability.

■ With respect to Roper's claim that the specific language of the Policy creates an ambiguity, we disagree. A provision in an insurance policy is considered to be ambiguous if it is subject to more than one reasonable interpretation. (*Donald B. MacNeal, Inc. v. Interstate Fire & Casualty Co.* (1985), 132 Ill. App. 3d 564.) In our view, the language of the Policy is not susceptible to Roper's interpretation. Accordingly, we find no ambiguity.

■ Next, Roper contends that the trial court erred in allowing Continental to file its affirmative defense. Specifically, Roper argues that the trial court erred in allowing Continental to file its affirmative defense to liability under coverage A because, in violation of section 2—616(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—616(c)), Continental had never offered proof as to its affirmative defense at trial. Section 2—616(c) provides:

> "A pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs, upon terms as to costs and continuance that may be just." Ill. Rev. Stat. 1985, ch. 110, par. 2—616(c).

Roper's argument is unpersuasive as it is predicated on an erroneous premise. At the time Continental filed its affirmative defense to Roper's counterclaim which alleged that Continental had breached the terms of the Policy by failing to indemnify Roper for the judgment and cost of defense in the Webster claim, the court had not yet heard arguments on that issue. Rather, prior to the filing of the affirmative defense, arguments had been heard only on the question as to whether coverage A or coverage B applied. Once the court held that coverage A applied, Continental filed its affirmative defense as to liability regarding the Webster claim. Prior to that time, there had been no "trial" on the issue of liability at which Continental could have offered proof. Thus, we conclude that the trial court properly granted Continental leave to file its affirmative defense.

Roper further argues that the trial court erred in holding that Continental had discharged its obligations under coverage A with respect

to the Webster claim. Following the first trial in the Webster lawsuit in mid-April 1982, judgment was entered on the verdict in favor of Webster and against Roper and Sears in the amount of $76,000. Roper appealed. In July 1982, pending appeal, Webster offered to settle for $70,000. In a letter dated November 9, 1982, Continental requested Roper to settle with Webster for $70,000 and informed Roper that it would accept liability for the $20,000 in excess of Roper's self-insured retention of $50,000. On December 9, 1982, Roper informed Continental that it disagreed with the limits Continental had put on its liability and stated that Roper did not wish to settle. It was not until after the Webster retrial verdict had been affirmed on appeal, resulting in a judgment in favor of Webster for $214,000, that Continental actually tendered the $20,000 check to Roper. Roper returned the check and Continental tendered it again. Roper eventually cashed the check with the understanding that it would not be precluded from filing an action against Continental for indemnification of the Webster judgment and costs of defense in the Webster action.

On appeal, Roper argues that Continental is not absolved from its obligations regarding the Webster claim for two reasons: (1) at the time of Continental's November 9, 1982, letter, there was a dispute as to whether coverage A or coverage B applied, each of which has different terms with respect to settlement; and (2) Continental's letter of November 9, 1982, did not constitute a valid tender.

■ First, regarding the dispute as to which coverage applies, the record does not support Roper's contention that the dispute existed as early as November 1982. Rather, it was not until Roper filed its second amended counterclaim with its third set of attorneys in October 1986 that Roper alleged that coverage B applied. Further, we find Roper's argument that its position with respect to coverage B could be assumed from the earlier pleadings unpersuasive.

With respect to the issue of tender, condition F of Columbia's underlying policy, incorporated into coverage A of the Policy, sets forth the following settlement procedures:

> "In the event the claimant or plaintiff, as the case might be, shall tender a bona-fide good faith, settlement demand in excess of the insured's retention, the payment of which would result in a full and final disposition of said claim or suit and such settlement demand is acceptable to either (1) the Insured, or (2) the Company (but not both), then in that event, with regard to that claim or suit, only:
>
> * * *
>
> (b) if such settlement demand is not acceptable to the insured

and the Company tenders to the insured an amount equal to the difference between the insured's retention and said settlement demand, then the Company's agreement to 'indemnify the insured for the ultimate net loss' hereunder shall be discharged and terminated and the Company shall have no further obligations with respect thereto.''

As previously stated, Webster's settlement demand of $70,000 was acceptable to Continental, but not to Roper. Thus, the issue is whether Continental tendered to Roper an amount equal to the difference between Roper's self-insured retention ($50,000) and the settlement demand ($70,000). It is undisputed that Continental did not actually make a tender of the $20,000 until June 3, 1985, but Continental contends that it was excused from formal tender because of Roper's refusal to settle.

■ It is well established that a debtor is excused of his obligation of formal tender where it is reasonably clear that such would be a vain, idle, or useless act. (*Osgood v. Skinner* (1904), 211 Ill. 229, 71 N.E. 869; *Gorham v. Farson* (1887), 119 Ill. 425, 10 N.E. 1; *Casciola v. Gardner* (1981), 101 Ill. App. 3d 852, 428 N.E.2d 921; *Needy v. Sparks* (1979), 74 Ill. App. 3d 914, 393 N.E.2d 1257.) In the present case, in a letter to Continental dated December 9, 1982, Roper made it clear that it would not agree to Continental's settlement terms. At that point, formal tender would clearly have been a useless act. Continental reiterated its position in favor of settlement prior to retrial of the Webster case in a letter to Roper dated March 1, 1984. Roper again rejected the offer. Based on these circumstances, we find that formal tender was excused. Accordingly, because Continental's offer to settle the Webster claim complied with the provisions of condition F of Columbia's underlying policy, incorporated into coverage A of the Policy, we find that the trial court properly determined that Continental had discharged its coverage A obligations to Roper with respect to the Webster claim.

For the aforementioned reasons, the judgments of the circuit court of Cook County are affirmed.

Affirmed.

QUINLAN and O'CONNOR, JJ., concur.