(No. 84115

KIRK ROBERTS, Appellant, v. NORTHLAND INSUR-
ANCE COMPANY *et al.*, Appellees.

*Opinion filed October 29, 1998.—Rehearing denied
February 1, 1999.*

FREEMAN, C.J., joined by MILLER and McMORROW, JJ.,
concurring in part and dissenting in part.

Edward R. Durree and James P. Lawson, of Kingery, Durree, Wakeman & Ryan, Assoc., of Peoria, for appellant.

Heyl, Royster, Voelker & Allen (Karen L. Kendall and Craig L. Unrath, of Peoria, and John E. Kerley, of Springfield, of counsel), for appellee Northland Insurance Co.

David E. Krchak, of Thomas, Mamer & Haughey, of Champaign, for appellee Chicago Motor Club Insurance Co.

JUSTICE HEIPLE delivered the opinion of the court:

Plaintiff Kirk Roberts appeals from a decision of the appellate court which reversed in part a declaratory judgment entered by the circuit court of Peoria County. The circuit court held that when a victim of an automobile accident is covered by two underinsured-motorist policies, each issued by a different insurance company, the amount of workers' compensation benefits received by the insured for the accident may be deducted only once from the insured's total coverage under the two policies. The appellate court reversed this holding, ruling that two deductions may be taken, one by each company. The appellate court affirmed, however, the circuit court's holding that neither company may deduct the amount of social security disability payments received by the insured. 291 Ill. App. 3d 727. For the reasons that follow, we reverse the appellate court's holding regarding workers' compensation, but affirm as to social security disability.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiff was seriously injured in an accident while driving a truck in the course of his employment. The driver of another vehicle involved in the accident, Thomas Fortune, was insured under an automobile liability policy with limits of $50,000. Fortune's insurer paid plaintiff $50,000 pursuant to this policy. Plaintiff was also awarded $196,114.26 in workers' compensation benefits as a result of the accident. In addition, plaintiff was awarded social security disability benefits of approximately $300 per month.

At the time of the accident, plaintiff was covered by two separate insurance policies issued by defendants Chicago Motor Club Insurance Company and Northland Insurance Company. These policies provided underinsured-motorist coverage in the amounts of $300,000 and $500,000, respectively. All parties agree that Chicago Motor Club's policy was "primary" while Northland's policy was "excess," meaning that Northland was required to pay under its policy only after other applicable insurance, such as the Chicago Motor Club coverage, was exhausted.

The Chicago Motor Club policy contained the following provision:

> "Amounts payable for damages under Under-Insured Motorists Coverage will be reduced by *** the present value of all amounts payable under any workmen's compensation, disability benefits or similar law ***."

The Northland policy contained a similar provision:

> "Any amount payable for damages under this [underinsured] coverage shall be reduced by all sums paid or payable under any workers' compensation, disability benefits or similar law."

In correspondence with plaintiff, Chicago Motor Club and Northland asserted that each company was entitled to "set off," or reduce, its payments to plaintiff by the amount of workers' compensation and social security dis-

ability benefits awarded to plaintiff for the accident. Plaintiff thereupon filed a declaratory judgment action in the circuit court of Peoria County to determine whether defendants could legally claim the workers' compensation and social security disability setoffs. Plaintiff alleged in his complaint that his damages exceeded $1 million.

The circuit court concluded that it was impermissible for both insurance companies to apply setoffs for the full amount of plaintiff's workers' compensation benefits. The court reasoned that because plaintiff received only one workers' compensation payment, only one setoff in the amount of that payment should be allowed. The court ruled that to enforce the literal language of each policy by applying two setoffs would create an unfair windfall for the insurers in violation of public policy.

The circuit court further held that the single setoff for workers' compensation benefits should be applied first to payments made to plaintiff by the primary insurance carrier, Chicago Motor Club. Because the amount of the workers' compensation setoff was less than the amount of plaintiff's coverage under the Chicago Motor Club policy, the circuit court ruled that the entire setoff should be applied to Chicago Motor Club, and none of it to Northland.

Finally, the circuit court ruled that no setoff would be allowed by either insurer for social security disability payments received by plaintiff, citing *Pearson v. State Farm Mutual Automobile Insurance Co.*, 109 Ill. App. 3d 649 (1982).

The appellate court reversed the circuit court's judgment with regard to the workers' compensation setoff. The appellate court held that because the Chicago Motor Club and Northland insurance policies were separate, the setoff provisions in each should be applied separately. The court acknowledged that if, instead of purchasing one $300,000 policy and one $500,000 policy, plaintiff had

instead purchased a single $800,000 policy, only a single setoff would apply. Nevertheless, the court held that because it knew of no Illinois law requiring setoffs to be applied to primary carriers only or multiple policies to be treated as one combined policy, each defendant was entitled to enforce the terms of its own policy by deducting the full amount of the workers' compensation benefits from plaintiff's coverage under each policy.

The appellate court affirmed, however, the circuit court's ruling that no setoff is allowed for social security disability benefits. The appellate court noted that, while a recipient of workers' compensation is required to reimburse the workers' compensation carrier for any amounts recovered from a tortfeasor, no such reimbursement is required in the case of social security benefits. Consequently, the court concluded, a setoff by the underinsured carrier for social security disability benefits received by the plaintiff would be unjustified.

We allowed plaintiff's petition for leave to appeal the appellate court's holding regarding the workers' compensation setoff. 166 Ill. 2d R. 315. In addition, defendants have requested cross-relief reversing the appellate court's holding regarding the social security disability setoff. 166 Ill. 2d R. 315.

## ANALYSIS

### I. Workers' Compensation

The construction of an unambiguous insurance policy provision is a question of law subject to *de novo* review. *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 529 (1995); *Quake Construction, Inc. v. American Airlines, Inc.*, 181 Ill. App. 3d 908, 913 (1989). The terms of an insurance policy are to be applied as written unless those terms contravene public policy. *Illinois Farmers Insurance Co. v. Cisco*, 178 Ill. 2d 386, 392 (1997).

Plaintiff contends that allowing both insurance companies to deduct the full amount of his workers' compensation benefits from the coverage limits of the two underinsured-motorist policies would violate public policy. Plaintiff notes that this court has held that the purpose of underinsured-motorist coverage is "to place the insured in the same position he would have occupied if injured by a motorist who carried liability insurance in the same amount as the policyholder." *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548, 558 (1992). Plaintiff points out that if the tortfeasor in the instant case had carried liability insurance in the same amount as he, he could have recovered $800,000 from the tortfeasor's insurance carrier. Plaintiff then would have been required to reimburse his workers' compensation carrier for the $196,114.26 in benefits he received, leaving him with a net insurance settlement of $603,885.74. Plaintiff argues that because underinsured-motorist coverage is intended to simulate the situation just described, his net settlement in the instant case should likewise be $603,885.74. Under the appellate court's holding permitting two setoffs, however, plaintiff's net settlement would instead be $407,771.48.

Defendants counter that an insurance contract must be construed so as to give effect to the intention of the parties as expressed in the agreement. *de los Reyes v. Travelers Insurance Cos.*, 135 Ill. 2d 353, 358 (1990). Defendants note that their respective policies clearly provide that underinsured-coverage payments be reduced by the amount of workers' compensation benefits received by the insured. In arguing that this unambiguous policy language must be enforced, defendants assert that plaintiff simply made a mistake in purchasing insurance coverage: rather than purchasing one policy with $800,000 in coverage, to which only one setoff would apply, he instead purchased two policies, with coverages of

$300,000 and $500,000, respectively. Because plaintiff purchased two policies, defendants contend his coverage is subject to two setoffs. Defendants argue that enforcing the literal language of the two policies does not violate public policy because plaintiff was free to purchase one policy instead of two.

We first note that underinsured-motorist coverage is a statutory creation. Section 143a—2(4) of the Illinois Insurance Code requires automobile insurers to include underinsured-motorist coverage in policies they issue. 215 ILCS 5/143a—2(4) (West 1992). The purpose of underinsured-motorist coverage is to place the insured in the same position he would have occupied if the tortfeasor had carried adequate insurance. *Cummins v. Country Mutual Insurance Co.*, 178 Ill. 2d 474, 483 (1997).

In *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548 (1992), this court held that an underinsured-motorist policy provision reducing the insured's coverage by the amount of any workers' compensation benefits received by the insured for the accident did not violate public policy. The court noted that an accident victim who recovers insurance proceeds from a tortfeasor is statutorily required to reimburse his employer for all workers' compensation benefits he has received for that accident up to the full amount of the insurance proceeds. *Sulser*, 147 Ill. 2d at 553; 820 ILCS 305/5(b) (West 1992). Therefore, because the victim of an adequately insured tortfeasor is not allowed to keep his workers' compensation benefits, the court held that the victim of an underinsured tortfeasor is likewise required to abide by the terms of a policy which allow the insurer to deduct the amount of workers' compensation benefits from the insured's coverage. *Sulser*, 147 Ill. 2d at 553, 558.

This court's holding in *Sulser* was based on the rationale that preventing a company from offsetting its underinsured coverage by the amount of workers' compen-

sation would unfairly allow the holder of an underinsured policy to retain in full both his insurance coverage and his workers' compensation benefits, a windfall denied to accident victims injured by adequately insured tortfeasors. The court thus held that it was not against public policy for an insurer to prevent such a windfall by offsetting its payments for underinsured coverage by the amount of workers' compensation benefits received by the insured as a result of the accident. *Sulser*, 147 Ill. 2d at 558.

This rationale is inapplicable, however, when, as in the instant case, an accident victim holds two separate policies from different companies and each company seeks to set off the insured's coverage by the full amount of workers' compensation benefits received by the insured. Although the insured receives his workers' compensation award only *once*, the insurers nevertheless attempt to subtract that award *twice* from the insured's coverage. Allowing such a double setoff would frustrate the General Assembly's intention that underinsured-motorist coverage "place the insured in the same position he would have occupied if injured by a motorist who carried liability insurance in the same amount as the policyholder." *Sulser*, 147 Ill. 2d at 558. If plaintiff had been injured by, and subsequently recovered damages from, a motorist who carried liability insurance in the amount of plaintiff's underinsured coverage, plaintiff would have been required to reimburse his employer only *once* for the amount of his workers' compensation benefits.

Defendants repeatedly assert that because the instant plaintiff held two separate insurance policies, two setoffs should be allowed. Public policy allows one setoff, however, because the setoff prevents the plaintiff from receiving an unfair windfall through his workers' compensation benefits, while still guaranteeing plaintiff

the level of coverage he would have received had he been injured by an adequately insured tortfeasor. A double setoff, on the contrary, deprives the victim of the level of coverage he would have received if the tortfeasor had been adequately insured, and therefore violates public policy.

In support of the proposition that they both should nevertheless be allowed a full setoff for plaintiff's workers' compensation benefits, defendants cite *Chester v. State Farm Mutual Automobile Insurance Co.*, 227 Ill. App. 3d 320 (1992), and *Obenland v. Economy Fire & Casualty Co.*, 234 Ill. App. 3d 99 (1992). Those cases, however, involved setoffs to underinsured coverage for amounts recovered from a tortfeasor's liability insurance, not setoffs for workers' compensation benefits as in the instant case. The purpose of the workers' compensation setoff, as explained above, is to simulate the reimbursement which the Workers' Compensation Act requires when an injured employee recovers both from workers' compensation and from a tortfeasor's liability insurer. See 820 ILCS 305/5(b) (West 1992). Setoffs for benefits received from workers' compensation thus implicate different considerations than setoffs for amounts received from a tortfeasor's liability insurance, and the cited cases are therefore inapplicable. Furthermore, because the parties to this appeal have not raised the issue of the proper allocation of setoffs among multiple carriers of underinsured coverage for amounts received from a tortfeasor's liability insurer, we do not address that question.

For the reasons stated, we hold that when an accident victim is covered by more than one insurance policy providing underinsured-motorist coverage, public policy permits only one setoff to that coverage for the amount of workers' compensation benefits received by the insured.

Having determined that only one setoff for workers' compensation is permitted, we must next determine how that setoff is to be allocated among the instant defendants. Chicago Motor Club contends that, if this court allows only one setoff, the setoff should first be applied against its coverage because it is the primary insurer. Northland counters that the setoff should instead be applied initially against its excess coverage because a primary insurer such as Chicago Motor Club typically receives higher premiums than an excess insurer. Northland also argues that allocating the setoff initially to the excess carrier will force the primary carrier immediately to pay the full limits of its policy and thereby hasten the insured's recovery.

We believe that, despite Northland's arguments, assigning the setoff initially to the primary carrier is the preferable result. The primary carrier receives higher premiums than the excess carrier because the primary carrier faces greater risk. The primary carrier must satisfy an insured's claim up to the full amount of its policy limits before the excess carrier is required to pay anything. Because it bears this greater burden, the primary carrier should also be the first to receive the benefit of the setoff in order to reduce the coverage upon which the insured has first claim. Furthermore, assigning the setoff first to the primary carrier will not result in any more delay in compensating the insured than would a contrary rule. In a typical claim situation, the primary carrier should be able to determine quickly and easily the amount of its net liability and pay the insured accordingly. *Cf. Cobb v. Allstate Insurance Co.*, 663 A.2d 38 (Me. 1995) (holding that setoff for amounts recovered from tortfeasor's liability insurer should be allocated to primary rather than excess carrier). We therefore hold that when an accident victim is covered by both primary and excess insurance policies offering underinsured-

motorist coverage, the primary insurer is entitled to deduct from its coverage the full amount of workers' compensation benefits received by the insured, after which any remaining setoff may then be applied to the excess coverage.

## II. Social Security Disability

The circuit and appellate courts both held that neither defendant may apply a setoff to its coverage for social security disability benefits received by plaintiff. Defendants contend that the provisions in plaintiff's policies allowing a setoff for social security disability should be enforced in order to prevent plaintiff from receiving a double recovery for the same accident. Defendants note that in *Sulser v. Country Mutual Insurance Co.*, 147 Ill. 2d 548 (1992), this court held that a setoff to underinsured-motorist coverage for workers' compensation benefits received by the insured is not against public policy. Defendants urge us to extend this holding to encompass a setoff for social security disability benefits received by the insured.

Plaintiff responds that a setoff for social security disability benefits is against public policy because, unlike workers' compensation benefits, social security disability benefits are not subject to mandatory reimbursement in the event an injured employee recovers from a tortfeasor's liability insurer. Plaintiff argues that deducting the amount of his social security benefits from his underinsured-motorist coverage would therefore fail to place him in the same position as if he had been injured by an adequately insured tortfeasor. We agree.

Social security disability benefits are awarded to compensate disabled employees who are insured under the federal Social Security Act. 42 U.S.C. § 423 (1988 & Supp. 1991). A recipient of social security disability benefits who also recovers damages from a tortfeasor as a result of the same accident which occasioned his dis-

ability benefits is not required to repay any portion of those benefits to the social security disability system. See *Richardson v. Belcher*, 404 U.S. 78, 30 L. Ed. 2d 231, 92 S. Ct. 254 (1971) (holding that provision requiring reimbursement of social security disability benefits for workers' compensation but not for recovery of tort damages is not unconstitutional). In contrast, the Illinois General Assembly has mandated that injured employees who receive workers' compensation benefits must make reimbursement of those benefits for any amounts recovered from a tortfeasor for the injury which occasioned the benefits. 820 ILCS 305/5(b) (West 1992).

Because of this difference in reimbursement requirements between workers' compensation and social security disability benefits, a motorist who is injured by, and recovers from, an adequately insured tortfeasor is required to repay any workers' compensation benefits received, up to the amount of tort damages received, but is not required to repay any portion of social security disability benefits received. As noted previously, the purpose of underinsured-motorist coverage is to "place the insured in the same position he would have occupied if injured by a motorist who carried liability insurance in the same amount as the policyholder." *Sulser*, 147 Ill. 2d at 558. If the instant plaintiff had been injured by a motorist who carried the same amount of insurance as he, he would not have been required to repay any of his social security disability benefits out of his recovery from the tortfeasor. Allowing a setoff to plaintiff's coverage for his social security disability benefits thus would frustrate the purpose of underinsured-motorist coverage.

Defendants argue, however, that social security disability benefits themselves are reduced by any workers' compensation payments received by an injured employee. See 42 U.S.C. § 424a (1988 & Supp. 1991). While this

observation is true, we fail to see how it supports defendants' contention that underinsured-motorist coverage should be reduced by the amount of social security disability benefits received by the insured. The fact that the instant plaintiff is receiving less in social security disability benefits than he would have if he had not been awarded workers' compensation has no bearing on the question of whether those social security disability benefits should be deducted from plaintiff's underinsured-motorist coverage.

Finally, defendants argue that this court should follow the lead of the Supreme Court of Iowa, which has upheld a policy provision allowing a setoff for social security disability benefits. *Gentry v. Wise*, 537 N.W.2d 732 (Iowa 1995). Not once in the cited opinion, however, does the Iowa court discuss the fact that a recipient of social security disability benefits is not required to make reimbursement of those benefits for any amounts received from a tortfeasor. This fact, ignored by the Iowa court, renders defendants' attempted setoff violative of the policy underlying underinsured-motorist coverage in Illinois.

We thus hold that a provision in an underinsured-motorist policy purporting to reduce the insured's coverage by the amount of social security disability benefits received by the insured violates public policy and is therefore unenforceable.

## CONCLUSION

We reverse the appellate court's holding that two insurers providing underinsured-motorist coverage are each allowed to deduct the amount of the insured's workers' compensation benefits from their coverage. We affirm the appellate court's holding that neither insurer may deduct the amount of the insured's social security

disability benefits. We affirm the circuit court's judgment in its entirety.

> *Appellate court judgment affirmed in part and reversed in part; circuit court judgment affirmed.*

CHIEF JUSTICE FREEMAN, concurring in part and dissenting in part:

I concur in that portion of the majority opinion which holds that an insurer may not set off social security disability benefits from its amounts payable to an insured. I also agree with the opinion to the extent that it holds that only a single setoff for workers' compensation benefits is permitted under the Illinois Insurance Code. I disagree, however, with the majority's conclusion that it is the primary insurer which is initially entitled to that setoff, and I write separately to express my views on the issue.

The majority holds that assigning the setoff initially to the primary carrier is "the preferable result" because the primary carrier "receives higher premiums than the excess carrier *** [and] faces greater risk." 185 Ill. 2d at 271. The majority asserts that "[t]he primary carrier must satisfy an insured's claim up to the full amount of its policy limits before the excess carrier is required to pay anything. Because it bears this greater burden, the primary carrier should also be the first to receive the benefit of the setoff in order to reduce the coverage upon which the insured has first claim." 185 Ill. 2d at 271. Although the majority's rule is alluring in its simplicity, as applied it fails to adequately give meaning to the intent of the language of the policies at issue and fails to take into account the relationship between a primary and an excess carrier. In my view, the question of the allocation of the workers' compensation benefits setoff must be determined by examining the language contained in each policy with respect to the risk insured and the level of

coverage provided for that risk. My approach to this question, as set forth in this separate opinion, in no way seeks to erode an insurer's duty to provide coverage to its insured and should not be applied to leave the insured without the coverage it is due. Rather, I attempt only to give effect to the intent of both insurers with respect to the nature of each insurer's duty to provide underinsured coverage to its insured under the circumstances at issue.

Before turning to the policy language, however, I believe that an overview of the concepts of both primary and excess coverage is useful. As one commentator has explained,

> "The basic insurance policy is written on a 'primary' basis. An individual's automobile liability and homeowner's policies are primary insurance policies. Primary insurance has been described as coverage 'whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability.' Simply stated, the primary policy provides 'first dollar' liability coverage up to the limits of the policy, in some instances subject to a small deductible." M. Marick, *Excess Insurance: An Overview of General Principles and Current Issues,* 24 Tort & Ins. L.J. 715, 716 (1989), quoting *Whitehead v. Fleet Towing Co.,* 110 Ill. App. 3d 759, 764 (1982).

Thus, when an individual purchases a $50,000 liability policy, only $50,000 in coverage is available to cover an occurrence for which the policy provides liability coverage. If a judgment is reached against the insured in the amount of $150,000, the primary insurer will not ordinarily be obligated to indemnify its insured for the additional $100,000 amount over the policy's stated limits of liability. In other words, the insured will be liable for the excess amount of the judgment.

Excess insurance, when it exists as part of an overall insurance package, provides a secondary level of coverage for the insured. Such coverage protects an insured in those instances where a judgment or a settlement exceeds

the primary policy's limits of liability. This type of insurance coverage "attaches only after a predetermined amount of primary insurance has been exhausted." S. Seaman & C. Kittredge, *Excess Liability Insurance: Law and Litigation,* 32 Tort & Ins. L.J. 653, 656 (1996). Thus, "[u]ntil such time as the limits of primary insurance coverage are exhausted, secondary coverage does not provide any collectible insurance." *Whitehead,* 110 Ill. App. 3d at 764-65. See also *Farmers Automobile Insurance Ass'n v. Iowa Mutual Insurance Co.,* 77 Ill. App. 2d 172 (1966).

I note that, although the majority opinion does not allude to it, the circumstances under which excess insurance coverage may come into play in any given case can vary. For example, excess coverage may arise "by coincidence" in situations where multiple primary insurance contracts apply to the same loss or occupance. 32 Tort & Ins. L.J. at 657. In these instances, courts examine the "other insurance" clauses contained in each of the policies to determine which is primary and which is excess. *Landmark American Insurance Co. v. Country Mutual Insurance Co.,* 275 Ill. App. 3d 1021 (1995). In contrast to "by coincidence" excess coverage, "true" excess insurance can also be purchased by the insured in separate contracts which are written by design. Such contracts are commonly known as "following form" or "specific" excess coverage. 32 Tort & Ins. L.J. at 657. In these cases, the insured specifically bargains with the carrier for an excess contract which either (i) solely protects the insured against the possibility that a claim will exceed the limits of the primary policy or (ii) contains its own terms, definitions, and exclusions and otherwise "follows form" to the primary policy. See 32 Tort & Ins. L.J. at 658. Under either scenario, however, the rates of such a "true" excess insurer are ascertained only after the excess insurer has given due consideration to the terms

of the underlying primary policy. 46 C.J.S. *Insurance* § 1138 (1993). As a result,

"[t]he premium paid by the insured for each successive layer of coverage is normally proportionately less expensive than for the immediate underlying layer. The lower premium charged for following form excess insurance is based upon both the decreased risk of a judgment or settlement within higher layers of coverage and the absence of a duty to defend the insured." 24 Tort & Ins. L.J. at 718.

An "umbrella" insurance policy encompasses yet another form of excess coverage. The umbrella policy provides two different coverages within its terms—a standard "following form" excess coverage, in addition to a broader coverage than is otherwise provided by the underlying primary carrier. See *Continental Casualty Co. v. Roper Corp.*, 173 Ill. App. 3d 760 (1988) (describing umbrella insurance). Due to the fact that the umbrella policy combines the characteristics of both a primary and a following form excess policy, commentators have described it as a "hybrid" policy. See 32 Tort & Ins. L.J. at 660; 24 Tort & Ins. L.J. at 719. Once an excess policy is triggered in a case, whether "by coincidence" or by design, the limits of the primary insurance must be exhausted before the excess carrier will be required to contribute to a settlement or a judgment.

In the case at bar, excess coverage arose "by coincidence" through the existence of the "other insurance" clause contained in the Northland policy. Under the express language contained in its policy, Northland agreed to provide underinsured-motorist coverage "excess" over any other collectible underinsured-motorist insurance "for any covered 'auto' while hired or borrowed from [the insured] by another 'trucker.' " The Chicago Motor Club (CMC) policy provides that "with respect to automobiles not owned by the subscriber, this policy will be excess and will apply only in the amount that the Company's limits of liability exceeds the sums of

the applicable limits of liability of all other applicable insurance." The record reveals (and the parties agree) that at the time of the accident giving rise to this litigation, the insured had owned the covered vehicle and had also leased the vehicle to another trucker; therefore, the Northland policy was excess over any other collectible underinsured-motorist insurance, *i.e.*, the limits of the CMC policy. The language contained in the two policies demonstrates that CMC and Northland chose to assume different levels of risk in this situation. Given the fact that Northland specifically attempted to limit its level of exposure in such circumstances, I believe that the workers' compensation benefits setoff should be allocated first to Northland, and not to CMC. To allow otherwise would guarantee that the primary carrier would never be faced with a maximum dollar contribution up to its policy limits when an excess carrier is involved and a setoff for workers' compensation benefits is available. Such a result runs counter to the purpose of excess coverage, *i.e.*, to provide collectible insurance once the underlying policy has been exhausted up to its limits.

I must clarify at this point in my discussion that I do not refer to "exhaustion" as that concept relates to the *insured*. Rather, my analysis focuses on the true out-of-pocket dollar amount each insurer ends up paying to the insured when all is said and done. In this case, by virtue of the setoff allowed by the majority, CMC will contribute only $153,855.74 towards the judgment while Northland will contribute the full $500,000 limit of its excess policy. The problem with the majority's result is that the full $500,000 in excess coverage has become collectible even though the $300,000 in primary coverage initially paid out by the primary carrier has been *replenished* in part by an outside source and, thus, has not been truly exhausted. As a result, the carrier which specifically wrote its policy so as not to provide "first dollar" cover-

age for the occurrence at issue is now left paying the lion's share of the insured's recovery. Stated differently, the excess carrier must pay up to the limits of its coverage even though the dollar amount of the primary insurer's contribution to the judgment has been reduced, by an outside source, to a dollar amount well below the primary policy's limits of coverage.

The majority allows the primary carrier the right to set off the workers' compensation benefit "in order to reduce the coverage upon which the insured has first claim." 185 Ill. 2d at 271. Given the language contained in the policies, however, I simply cannot fathom why the primary insurer should be allowed to set off the very "first dollar" coverage it agreed to provide its insured in its policy. In my view, the first right to a reduction of amounts payable belongs to the excess carrier because that carrier agreed to cover the insured at a level secondary to the primary carrier. Here, the excess carrier specifically wrote its contract to provide only secondary coverage for the accident which formed the genesis of the dispute. As the "last in," the excess carrier should be the "first out" because such a result more properly reflects the level of risk that was underwritten and the type of coverage that was bargained and paid for. Under my analysis, Northland's true out-of-pocket expense in this case would be the limits of its policy, less the amount of the setoff, while CMC's true out-of-pocket cost would be the limits of its coverage under its policy. Such a result gives full effect to the level of risk each carrier intended to expose itself to with respect to the type of accident at issue.

Despite the intent of the insurers as evinced by the language of their respective policies, the majority justifies assigning the setoff initially to the primary carrier because the primary carrier receives higher premiums and faces greater risk. See 185 Ill. 2d at 271-72. Interestingly enough, the premium received by CMC under its

policy was $469, and the premium received by Northland was $1,778. Notwithstanding the fact that the record fails to even support the majority's analysis with regard to which carrier received the higher premium, I do not believe the resolution to this question turns on a face value comparison of the amount of premiums charged. This is especially true in cases where the excess coverage was written by design. The premiums in such circumstances are lower because the insurers are not covering the same risk—they are covering separate and clearly defined *layers* of risk. In this case, although I acknowledge that both of the policies at issue were written as primary policies, the premiums charged for each policy were nevertheless calculated upon the types of risks covered by the policy. As such, Northland calculated its premium by assessing the risk it was insuring against at each level, *including the level of secondary coverage assumed in the "other insurance" clause*. Had Northland written its policy so as to provide primary level coverage for the accident at issue, its premium would have been higher in order to reflect the higher level of coverage provided. Moreover, although the majority's statement that the primary carrier "faces greater risk" is correct, I do not see why that fact alone is determinative of the question. The primary carrier faces greater risk because, by the very terms of its agreement with the insured, it chose to provide to the insured a primary level of coverage, as opposed to a secondary level. As a result, the premiums assessed against the insured reflected the cost of this primary level of insurance. The majority's analysis ignores the fact that excess premiums are lower because excess coverage is, by its very nature, not supposed to be triggered until the underlying policy has been exhausted up to its limits. The majority's initial allocation of the setoff to the primary carrier, however, ensures that the limits of a primary policy are never truly paid

out before the coincidental excess carrier must provide collectible insurance. While this result is of no moment to the insured, the result *vis à vis* the insurers turns the concept of excess coverage on its head.

The majority cites *Cobb v. Allstate Insurance Co.*, 663 A.2d 38 (Me. 1995), in support of its conclusion that the primary insurer is entitled to take the initial setoff of workers' compensation benefits from its amounts payable to the insured. The court in *Cobb*, however, held that a setoff for amounts recovered from a tortfeasor's liability carrier should be allocated to the primary rather than to the excess carrier, which is an entirely different question from that which is raised in this case. Moreover, the court in *Cobb* reached its conclusion solely on the basis that allowing the primary carrier the setoff would allow it to settle more quickly and remove itself from further legal disputes. Although some might be inclined to find such policy sentiments to be laudatory, I do not find them legally persuasive in the face of the specific contractual language contained in each of the policies at issue in this case. In my view, the allocation question must be resolved on the basis of the intent of the insurers as evinced in the policies issued to the insured.

The majority unfortunately chooses to address the concept of excess insurance in a generic manner and fails to distinguish between the various forms in which such coverage can arise in a given case. As a result, the simplistic rule announced today will doubtless be applied *pro forma* in all cases in which an excess carrier claims an allocation of a setoff over a primary carrier. I am confident that the insurance industry's response to this overly generalized rule will be an increase in the cost of "true" excess insurance premiums. I note that such premiums "[t]raditionally *** were very low as excess insurers anticipated not having any involvement in defending the insured, minimal claims handling, and

rarely, if ever, being called upon to indemnify the insured for a settlement or judgment." 32 Tort & Ins. L.J. at 653. As a result of the low cost of excess premiums, secondary layers of coverage have, over the years, become more attractive to consumers—"[m]ore excess insurance contracts have been issued as commercial and professional insureds purchase excess coverage as part of comprehensive risk management programs." 32 Tort & Ins. L.J. at 653. If excess coverage becomes too cost prohibitive, then consumers will be less likely to purchase it. Sadly, this, in turn, will lead to fewer avenues of indemnification for tort victims.

For the foregoing reasons, I dissent from that portion of the majority opinion which assigns the setoff for workers' compensation benefits initially to CMC. I concur in the opinion in all other respects.

JUSTICES MILLER and McMORROW join in this partial concurrence and partial dissent.