# ILLINOIS OFFICIAL REPORTS

## Supreme Court

***Skokie Castings, Inc. v. Illinois Insurance Guaranty Fund*, 2013 IL 113873**

| | |
|---|---|
| Caption in Supreme Court: | SKOKIE CASTINGS, INC., as Successor to Wells Manufacturing Company, Appellee, v. ILLINOIS INSURANCE GUARANTY FUND, Appellant. |
| Docket No. | 113873 |
| Filed | October 18, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Insurance Guaranty Fund's statutory obligation to pay claims against insolvent member insurers which are liquidated is properly construed to extend to workers' compensation claims over $300,000, whether the insurer is excess or primary and whether or not payments are made directly to the employee. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Michael B. Hyman, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Steven T. Whitmer, Hugh S. Balsam and Christopher D. Seps, of Locke Lord Bissell & Liddell, of Chicago, for appellant.

Jack M. Shanahan and Lauren Zimmer, of Inman & Fitzgibbons, Ltd., of Chicago, for appellee.

Justices

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Justices Freeman, Garman, Burke, and Theis concurred in the judgment and opinion.

Chief Justice Kilbride dissented, with opinion.

Justice Thomas dissented, with opinion.

**OPINION**

¶ 1    When an insurance company authorized to transact business in Illinois becomes insolvent and is unable to pay claims under policies it has issued to its insureds, the Illinois Insurance Guaranty Fund will step in to pay those claims after an order has been entered liquidating the company. See 215 ILCS 5/532 *et seq.* (West 2010). The Fund's obligation to pay covered claims is subject to certain qualifications and limitations, including a cap on the amount it will pay on any particular claim. That cap is inapplicable, however, to "any workers compensation claims." 215 ILCS 5/537.2 (West 2010).

¶ 2    There is no dispute that claims under policies purchased by employers to provide *primary* coverage for awards granted to their injured employees under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2010)) fall within the "workers compensation claim" exemption from the statutory cap. The question presented by this declaratory judgment action is whether claims under policies providing *excess* coverage for workers' compensation awards are exempt as well.

¶ 3    On cross-motions for summary judgment filed by an employer whose workers' compensation carrier had been liquidated and the Illinois Insurance Guaranty Fund (the Fund), the circuit court of Cook County answered this question in the affirmative and concluded, *inter alia*, that claims under the excess coverage policies purchased by the employer in this case were not subject to the statutory cap, that the Fund had improperly terminated payments for the injured employee's workers' compensation award after the cap was reached, and that the Fund was obligated to reimburse the employer for all workers' compensation payments it had made to its injured employee following liquidation of the employer's workers' compensation carrier. The appellate court unanimously affirmed. 2012 IL App (1st) 111533. We granted the Fund's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013). For the reasons that follow, we now affirm the judgment of the appellate court.

-2-

¶ 4                                  BACKGROUND

¶ 5        The pertinent facts are undisputed. Wells Manufacturing Company was a Skokie, Illinois, business which manufactured alloy and gray alloy castings and ductile iron.[1] In the course of its business, Wells elected to bring itself within the coverage of the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2010)). By making that election, Wells did not relieve itself of any liability for the injuries sustained by its employees. It merely immunized itself from being sued in tort by its employees for recovery of damages for accidental injuries they sustained arising from and in the course of their employment. 820 ILCS 305/2, 5 (West 2010). Once the election occurred, Wells' employees were limited to their remedies under the Workers' Compensation Act. 820 ILCS 305/5(a), 11 (West 2010).

¶ 6        Employers such as Wells which elect to avail themselves of the provisions of the Workers' Compensation Act must make provision for securing payment of the compensation provided for by the statute. They may do so by purchasing insurance providing full coverage (820 ILCS 305/4(a)(3) (West 2010)), but that is not their only option. They may also elect to demonstrate to the Illinois Workers' Compensation Commission that they possess the financial resources to self-insure (820 ILCS 305/4(a)(1) (West 2010)); they may furnish "security, indemnity or a bond" guaranteeing payment (820 ILCS 305/4(a)(2) (West 2010)); or they make some other arrangement satisfactory to the Commission (820 ILCS 305/4(a)(4) (West 2010)). In addition, the law affords them the flexibility to use any of these latter three options (self-insuring; furnishing security, etc.; or "other") to secure payment of part of their obligation and then to purchase an excess coverage policy for the remainder. 820 ILCS 305/4(a)(2), (3) (West 2010). In this case, that is the option Wells elected to take, self-insuring in part and purchasing workers' compensation excess coverage from Home Insurance Company for the remainder.

¶ 7        The terms of the coverage which Wells purchased from Home Insurance were set forth in two related policies which took effect on August 1, 1984, an "Aggregate Excess Workers' Compensation and Employers' Liability Policy" and a "Specific Excess Workers' Compensation and Employers' Liability Policy." The "Aggregate Excess" policy specified generally that it would indemnify Wells for the sums Wells actually paid for either "compensation and other benefits required of [it] by the workers' compensation law" or "by reason of *** Employers' Liability, which shall mean the liability imposed upon [Wells] by law for damages because of bodily injury by accident or disease, [etc.]." Correspondingly, it also afforded coverage for, among other things, "[l]egal expenses in connection with hearings before the State Industrial Commission" or "reasonable legal and other expenses in defense of any claim or suit against [Wells]" alleging employer liability, as the case might be.

¶ 8        The second policy, titled "Specific Excess Workers' Compensation and Employers'

---

[1]At some point, and the record does not show when or how, Skokie Castings, Inc., became a corporate successor to Wells Manufacturing. Skokie Castings initiated this litigation as Wells' successor and is the nominal plaintiff. Because the operative facts all involve Wells, however, we shall refer to the plaintiff as Wells in order to avoid confusion.

Liability Policy," specified that Home Insurance agreed to indemnify Wells "against excess loss, subject to the limitations, conditions and other terms of this policy, which [Wells] may sustain on account of *** compensation and other benefits required of [Wells] by the Workers Compensation Law." Under the policy, Wells' retained limit of liability, that is, the amount Wells had to pay out itself before Home Insurance's obligations under the policy would be triggered, was $200,000. The upper limit of Home Insurance's obligation to indemnify Wells was listed as "Statutory Workers' Compensation—Unlimited Employers' Liability."

¶ 9 In February of 1985, while the foregoing policies were in effect, a Wells employee named Mona Soloky was seriously injured in the course and scope of her employment. Soloky filed a claim for benefits with the Illinois Industrial Commission (now the Illinois Workers' Compensation Commission (see Pub. Act 93-721, eff. Jan. 1, 2005)) pursuant to the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2010)). The Commission determined that Soloky was totally and permanently disabled and awarded her all her reasonable and necessary medical costs plus weekly benefit payments of $394.25 for life.

¶ 10 Wells paid the amounts awarded to Soloky by the Commission until the $200,000 retained limit of liability set forth in its excess coverage policies with Home Insurance was reached. Thereafter, it looked to Home Insurance to bear the cost of Soloky's workers' compensation award. Home Insurance employed a third-party administrator named the Martin Boyer Company to handle the payments it owed under the excess coverage policies it had issued to Wells. Through the Martin Boyer Company, Home Insurance paid benefits to Soloky pursuant to the Commission's award. It did so until it became insolvent, went into receivership and was liquidated.

¶ 11 As noted at the outset of this opinion, Illinois has established the Insurance Guaranty Fund to help protect insureds such as Wells where, as here, their insurance carriers become insolvent and cannot meet their policy obligations. 215 ILCS 5/532 (West 2010). All insurance companies authorized to transact business in Illinois are members of the Fund (215 ILCS 5/534.5 (West 2010)) and must remain so as a condition of their doing business here (215 ILCS 5/535 (West 2010)). Home Insurance Company was such a member.

¶ 12 The Fund itself is divided into separate accounts, one for automobile insurance and the other for all other insurance to which provisions of the Insurance Guaranty Fund statutes apply, including insurance covering workers' compensation. 215 ILCS 5/535 (West 2010). Members of the Fund, *i.e.*, all insurance companies authorized to conduct business here, are charged an annual fee to cover the Fund's contingent expenses. 215 ILCS 5/537.1 (West 2010). In addition, the Fund assesses every member of the Fund for a share of the total amount the Fund must pay out to cover claims when a member becomes insolvent. For purposes of calculating the assessments, which are made annually, the two Fund accounts, auto and other, are treated separately, but within each account no distinction is drawn between primary and excess policies. 215 ILCS 5/537.6 (West 2010).

¶ 13 When an order of liquidation is entered against an insolvent Fund member, the Fund has a statutory obligation to pay "covered claims" which existed prior to entry of the liquidation order or arising within 30 days after the entry of such order, or within other specified time

frames, and subject to various conditions and limitations. 215 ILCS 5/537.2 (West 2010). For purposes of the statute, a "covered claim" is defined to include any "unpaid claim for a loss arising out of and within the coverage of an insurance policy to which [the law governing the Fund applies] and which is in force at the time of the occurrence giving rise to the unpaid claim." 215 ILCS 5/534.3(a) (West 2010).

¶ 14    According to the record before us, an insured whose carrier has been liquidated invokes the Fund's protection by submitting a "proof of claim" form to it to document the unpaid claim for which it is seeking benefits from the Fund. There is no question that Wells complied with the requisite procedures, nor is there any dispute that the amounts owed by Home Insurance under the workers' compensation excess coverage policies purchased by Wells to help satisfy its obligations under the Workers' Compensation Act and which were left unpaid when Home Insurance became insolvent and was liquidated met the requirements of a "covered claim" under section 534.3(a) of the Insurance Code (215 ILCS 5/534.3(a) (West 2010)), triggering the Fund's obligations under section 537.2 (215 ILCS 5/537.2 (West 2010)). The Fund therefore honored that claim and assumed, from Home Insurance, responsibility for payment of the sums still due Soloky under the Commission's award.

¶ 15    After paying approximately $250,000 to Soloky, the Fund notified Wells of its belief that Wells' claim against the Fund was subject to a $300,000 cap, which the Fund anticipated would soon be reached. The Fund indicated that once the $300,000 maximum was exhausted, it would cease making payments toward the Soloky award and that arrangements needed to be made to transfer responsibility for the matter to some other person or entity. Several months later, the Fund did as it advised Wells it planned to do and stopped the payments to Soloky. Since that time, Wells has undertaken direct financial responsibility for payment of Soloky's workers' compensation award. Wells estimates that by 2010, when this litigation commenced, this additional sum exceeded half a million dollars.

¶ 16    Section 537.2 of the Illinois Insurance Code (215 ILCS 5/537.2 (West 2010)) imposes certain qualifications and limitations on the Fund's obligations, even where, as here, a claim is covered. Among those is that where an order of liquidation was entered on or after January 1, 1988, and before January 1, 2011, the Fund's obligation shall not exceed $300,000. 215 ILCS 5/537.2 (West 2010). It is this provision which is the basis for the Fund's refusal to continue payments related to Soloky's workers' compensation award.

¶ 17    Although Wells is once again paying the Soloky award directly, as it did before the retention limit was reached, it has continued to dispute the Fund's assertion that the Fund's financial obligations with respect to the claims related to Soloky which were left unpaid after Home Insurance was liquidated are subject to the foregoing statutory $300,000 cap. Wells argues that the law contains an express exception to the cap for "any workers compensation claims" (215 ILCS 5/537.2 (West 2010)) and asserts that the claims left unpaid under its excess coverage workers' compensation policies when Home Insurance dissolved constitute such "workers compensation claims." In Wells' view, the exception to the statutory cap is therefore applicable.

¶ 18    The Fund rejected Wells' interpretation of the law and refused to make further payments. Wells therefore commenced this action for declaratory judgment against the Fund in the

circuit court of Cook County pursuant to section 2-701 of the Code of Civil Procedure (735 ILCS 5/2-701 (West 2010)). Wells' complaint requested a determination that the $300,000 cap set forth in section 537.2 of the Insurance Code did not and does not apply under the circumstance of this case, that the Fund improperly terminated payments for Soloky's workers' compensation award once the statutory cap was reached, that the Fund is and remains liable for any claims left unpaid when Home Insurance was liquidated, and that the Fund should reimburse Wells for the sums it was required to pay toward Soloky's workers' compensation award after the Fund ceased payment.

¶ 19    The Fund moved to dismiss pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)). It did not dispute Wells' version of the facts, nor did it challenge the legal sufficiency of Wells' complaint for declaratory relief. Rather, it argued that Wells' construction of the Insurance Code was erroneous, that the $300,000 cap does apply here, and that Wells' cause of action should therefore fail on the merits.

¶ 20    Wells responded that the Fund's motion was procedurally improper. The Fund, in turn, argued that a motion to dismiss under section 2-615 is an appropriate mechanism for disposing of an action for declaratory relief on the merits. The circuit court subsequently decided that the Fund's motion would be treated as a motion for summary judgment. Wells replied to it as such and filed its own cross-motion for summary judgment.

¶ 21    A hearing on the parties' cross-motions was conducted by the circuit court. Supplemental briefing followed, after which the court entered a detailed and well-reasoned written order. After setting forth the facts and examining the applicable law, the court concluded that Wells' claim under its workers' compensation excess coverage policy fell within the plain meaning of "any workers compensation claims" under section 537.2 of the Insurance Code and was therefore exempt from the $300,000 cap limiting the Fund's obligations under other types of policies. Accordingly, it denied the Fund's motion for summary judgment, granted summary judgment in favor of Wells and concluded that the Fund had improperly terminated its payment of benefits owed to Soloky pursuant to the award granted by the Workers' Compensation Commission; that the Fund is liable for all sums Wells paid to Soloky or on her behalf pursuant to her workers' compensation award following Home Insurance's liquidation and must reimburse Wells for those amounts; and that the Fund "continues to owe benefits to Soloky pursuant to the Worker's Compensation Commission's Award subject to the Guaranty Fund Act."

¶ 22    The Fund appealed. As in the trial court, the Fund took no issue with the facts as asserted by Wells. Its argument was simply that the circuit court erred in concluding that Wells' claim for coverage under its excess workers' compensation policies with Home Insurance with respect to Soloky's workers' compensation award qualified as "any workers' compensation claim" within the meaning of section 537.2 of the Insurance Code. In the Fund's view, that term is applicable only to claims for workers' compensation benefits filed by an injured employee. Because Wells' claim here did not meet that definition, the Fund argued that section 537.2's exemption is inapplicable, that its obligation to make payments following Home Insurance's liquidation has now been fully exhausted, and that summary judgment should therefore have been entered in its favor and against Wells.

-6-

¶ 23    The appellate court rejected the Fund's interpretation of the law and affirmed. 2012 IL App (1st) 111533. This appeal to our court followed. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 24                                    ANALYSIS

¶ 25    In undertaking our review, we begin by noting that while the dispute before us was triggered by the work-related injury of an employee who worked for an employer which had elected to bring itself within the coverage of the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2010)), this is not a workers' compensation case. There is no disagreement as to the meaning of the Workers' Compensation Act or its applicability to Soloky, the employee who was injured. Soloky's entitlement to benefits was decided when she filed her claim under the Act with the Workers' Compensation Commission and the Commission entered an award in her favor.

¶ 26    The matter before us here involves the separate and distinct question of how the financial burden of paying Soloky's award will be distributed. Because Soloky's employer elected to purchase insurance to help meet its obligations under the Workers' Compensation Act, as the Act permitted, and that coverage was in effect when Soloky was injured, resolution of this question turns on issues of insurance law. Because the company providing coverage to Soloky's employer for her workers' compensation award was a member of the Fund and was liquidated before meeting its obligations under the policies it had issued, the dispositive issue of insurance law in this case is the scope of the Fund's obligations under the Insurance Code.

¶ 27    The case was decided by the circuit court on cross-motions for summary judgment. Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). We review the circuit court's grant of summary judgment *de novo*. *De novo* review is also appropriate because the case turns on the construction of provisions of the Insurance Code, and statutory construction presents a question of law. See *Pielet v. Pielet*, 2012 IL 112064, ¶ 30.

¶ 28    When construing a statute, our primary objective is to give effect to the legislature's intent. The best indication of legislative intent is the statutory language. *Wilkins v. Williams*, 2013 IL 114310, ¶ 14. Legislative intent may also be ascertained by considering the reason and necessity for the law, the evils to be remedied, and the objects and purposes to be obtained. *Carter v. SSC Odin Operating Co.*, 2012 IL 113204, ¶ 37.

¶ 29    Every state has established an insurance guaranty fund to protect policyholders in the event that an insurance company becomes insolvent. *Hasemann v. White*, 177 Ill. 2d 414, 417 (1997). Ours is the Illinois Insurance Guaranty Fund (the Fund). This court has described the Fund as "a nonprofit entity created to protect policyholders of insolvent insurers and third parties making claims under policies issued by insurers that become insolvent." *Id.* at 415-16. Its purpose is

> " 'to place claimants in the same position that they would have been in if the liability insurer had not become insolvent.' *Lucas v. Illinois Insurance Guaranty Fund*, 52 Ill. App. 3d 237, 239, 367 N.E.2d 469, 471 (1977). The Fund is not a collateral or

independent source of recovery; rather, it is a substitution when the expected coverage ceases to exist. *Lucas*, 52 Ill. App. 3d at 240, 367 N.E.2d at 471." *Gines v. Ivy*, 358 Ill. App. 3d 607, 609 (2005).

¶ 30　　When an insurance company is liquidated, the Fund steps into its shoes. Indeed, the Insurance Code provides that "[t]he Fund shall be deemed the insolvent company to the extent of the Fund's obligation for covered claims and to such extent shall have all rights, duties, and obligations of the insolvent company, subject to the limitations provided in this Article, as if the company had not become insolvent." 215 ILCS 5/537.4 (West 2010).

¶ 31　　Because the Fund serves as a substitute for the defunct insurer, an insured party can never recover *more* from the Fund than it would have been entitled to receive under the policy it originally purchased from its defunct insurer. Section 537.2 of the Insurance Code expressly states that "[i]n no event shall the Fund be obligated *** in an amount in excess of the face amount of the policy from which the claim arises." 215 ILCS 5/537.2 (West 2010). In some circumstances, however, an insured party may be forced to accept *less* than would have been due under the policy issued by a defunct insurer. That is so because, as we have already discussed, the Insurance Code caps the Fund's obligation to pay a covered claim at $300,000 where the order liquidating the insured's carrier was entered on or after January 1, 1988, and before January 1, 2011. 215 ILCS 5/537.2 (West 2010).

¶ 32　　The statutory limitation contains an important exception. It does not apply to "any workers compensation claims." 215 ILCS 5/537.2 (West 2010). For purposes of this provision of the Code, "any workers compensation claims" means, of course, any *covered* workers' compensation claims. It must mean that because the statutory obligations of the Fund as set forth in section 537.2 of the Insurance Code (215 ILCS 5/537.2 (West 2010)) pertain only to "covered claims" as defined by section 534.3(a) of the Code (215 ILCS 5/534.3(a) (West 2010)). If a workers' compensation claim failed to meet the threshold statutory definition of a "covered claim," the obligations of the Fund would not come into play.

¶ 33　　Section 534.3(a) defines "covered claim" as "an unpaid claim for a loss arising out of and within the coverage of an insurance policy" to which this portion of the Insurance Code applies and which is in force at the time of the occurrence giving rise to the unpaid claim. 215 ILCS 5/534.3(a) (West 2010). For purposes of the Fund, a covered workers' compensation claim is therefore an unpaid claim for a loss "arising out of and within the coverage of" a workers' compensation insurance policy to which this portion of the Insurance Code applies and which is in force at the time of the occurrence giving rise to the unpaid claim.

¶ 34　　In this case, there is no question that the amounts owed by Home Insurance under the policies purchased by Wells which were left unpaid when Home Insurance became insolvent and was liquidated qualified as "covered claims" within the meaning of section 534.3(a) (215 ILCS 5/534.3(a) (West 2010)) and were therefore within the Fund's protection under section 537.2 of the Code (215 ILCS 5/537.2 (West 2010)). Moreover, it is indisputable that these covered claims arose out of and were within the coverage of policies which had been purchased to help insure Wells against liability for workers' compensation awards granted

by the Industrial Commission pursuant to the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2010)). The claims therefore qualified as covered workers' compensation claims for purposes of section 537.2. Because covered workers' compensation claims are exempt from section 537.2's $300,000 cap on the Fund's liability, the cap is inapplicable in this case.

¶ 35    Here, as it did below, the Fund attempts to avoid this conclusion by arguing the statutory reference to "any workers compensation claims" embraces only claims for workers' compensation benefits brought directly by injured employees. This contention is untenable and was properly rejected by the lower courts. As we have just discussed, the only claims protected by the Fund are "covered claims" which, by definition, are claims arising out of insurance policies subject to this portion of the Insurance Code. In workers' compensation cases, claims for benefits by injured employees arise under the Workers' Compensation Act, not policies of insurance, and are made to the Workers' Compensation Commission, not the employer or the employer's insurer. See 26 Ill. Jur. *Workers' Compensation* § 6:04 (2004). If successful, the claims result in awards by the Commission, and it is those awards that the employer must pay directly, through insurance, or through a combination of those methods. An injured employee's administrative claim for statutory benefits from the Commission is therefore entirely separate and distinct from the type of insurance claim to which sections 534.3(a) and 537.2 of the Code refer.

¶ 36    Although Wells' policy from Home Insurance provided excess rather than primary coverage for Wells' liability under the Workers' Compensation Act, that distinction is of no consequence for purposes of this appeal. As discussed earlier in this opinion, the Workers' Compensation Act recognizes that employers may secure their obligation to pay the compensation for which the Act provides in a variety of ways and references both excess liability insurance policies (820 ILCS 305/4(a)(2) (West 2010)) as well as policies which provide coverage for all of the payments for which an employer is liable under the Act (820 ILCS 305/4(a)(3) (West 2010)). While it is true that these two types of policies may operate differently, the record in this case indicates that once the $200,000 retention limit was reached, Home Insurance processed the amounts due with respect to Soloky's workers' compensation award by using a third-party administrator and making payments directly to Soloky, the same procedure normally employed where a workers' compensation policy provides primary coverage.

¶ 37    Even in situations where an excess carrier reimburses the employer for payments due an injured employer under a workers' compensation award rather than paying the injured employee directly, the difference is one of mechanics, not substance. Whether coverage is considered primary or excess and whether payment due under a policy is made directly to the injured employee or as reimbursement to the employer for payments it made to the injured employee, the fact remains that it is always the employer who has purchased the coverage. The purpose of the coverage is always the same: to help the employer secure its obligation to pay the compensation awarded to its injured employees by the Workers' Compensation Commission. And legal liability for paying the Commission's award is always unchanged. It remains with the employer. Whenever and however a workers' compensation carrier pays benefits pursuant to an insurance policy it has issued, it is paying those benefits on the

employer's behalf. See Illinois Workers' Compensation Commission, Handbook on Workers' Compensation and Occupational Diseases 4 (2013). By statute, an insurance carrier can only be held primarily liable for paying an injured employee under limited circumstances. See 820 ILCS 305/4(g) (West 2010). In setting forth those circumstances, the law makes no reference to and does not differentiate between primary and excess coverage policies. For purposes of the Fund, both are therefore properly regarded as workers' compensation insurance polices.

¶ 38    Nothing in the terms of the Workers' Compensation Act or the law governing the Insurance Guaranty Fund provides any basis for reaching a contrary conclusion, *i.e.*, that a policy cannot be deemed to provide workers' compensation coverage simply because the coverage it affords is excess rather than primary. To say that a policy must provide full coverage in order to qualify as a workers' compensation insurance policy would therefore require that we depart from the plain language of the law and read into it exceptions, limitations or conditions which the legislature did not express. That, of course, is something we may not do. *People ex rel. Madigan v. Kinzer*, 232 Ill. 2d 179, 184-85 (2009).

¶ 39    Something else we may not do is construe a statute in a way that would yield absurd or unjust results. *Township of Jubilee v. State of Illinois*, 2011 IL 111447, ¶ 36. But that is precisely what would happen if we interpreted the law to mean that the only workers' compensation policies exempt from the $300,000 statutory cap are those providing primary coverage. If that were how the law worked, an employer who elected to secure its workers' compensation obligations by purchasing a primary coverage policy but with a large deductible could receive payments from the Fund without limitation after its insurer became insolvent, while an identical employer who purchased an excess policy from the very same insurer with a retained liability limit identical to the first employer's deductible would have to bear the full burden of workers' compensation costs once the $300,000 cap was reached. In other words, we would have a situation where identical employers purchase insurance policies from the identical insurer to help cover the same type of loss—workers' compensation obligations—above the identical loss threshold, yet one would enjoy the full protection of the Fund and the other would not.

¶ 40    Such an anomaly cannot be justified based on differentials between premiums paid by employers who elect to purchase primary workers' compensation coverage and premiums paid by those who elect to secure their workers' compensation obligations through excess coverage policies. For one thing, there is no evidence in the record before us regarding the existence of such differentials or how significant they may be. Many factors affect the premiums charged by insurers, and it could be that a policy providing excess coverage will actually be comparable in cost to a policy providing primary coverage where the loss retention amount and the deductible amounts in the respective policies are the same. But again, this record is silent on the matter and we cannot found our interpretation of the law on speculation.

¶ 41    Even if we accepted, for the sake of argument, that excess coverage policies are normally less expensive than primary coverage policies, that still would not alter our conclusion. For purposes of this case, any difference in premiums paid is significant only if (1) employers who pay lower premiums for excess coverage receive disproportionately better treatment

under the law when their insurance carriers are liquidated than employers who pay higher premiums for primary coverage, and (2) the Insurance Guaranty Fund is thereby left having to pay out more than a liquidated member itself would have had to pay under a particular policy and to make such payments using resources for which it has not obtained and cannot obtain funding, leaving it unable to meet its statutory obligations. But none of these things actually happens. The Fund is structured so that insureds purchasing coverage to meet their obligations under the Workers' Compensation Act receive just what they paid for, no more and no less, and so that the Fund itself will be able to collect whatever monies are necessary to provide that protection.

¶ 42        Starting with the last point, which pertains to burdens on the Fund, it is important to keep in mind that it is not insureds who fund the Insurance Guaranty Fund. As explained earlier, Fund members do. Home Insurance was, itself, a member of the Fund. The statutory assessments it was required to make while it was still doing business in Illinois helped pay claims which would otherwise have gone unpaid when other members of the Fund became insolvent. Now that Home Insurance has become insolvent, it is entirely fair and appropriate that the other members of the Fund now contribute toward paying the claims which Home Insurance left unpaid, and that they do so to the full extent specified by the law.

¶ 43        There is no basis whatever for concern that this will place an undue burden on the Fund's resources. The assessments which each Fund member must pay is based on the proportion that the particular member's net direct written premiums for the preceding year bears to the total net direct written premiums of all the member companies for the preceding year on the kinds of insurance in that account (auto or other). Although the law includes a limit on the amount any given member must pay in a particular year, if the total assessment in an account (auto or other) together with the other assets in the particular account are not sufficient to meet that account's obligations for the year in question, the obligation is not extinguished or reduced. Payment is simply delayed until funds become available. 215 ILCS 5/537.6 (West 2010). Under this system, the Fund is assured that it will ultimately recover any and all amounts it must pay out under the law to meet the obligations of its insolvent members, regardless of the type of risk or scope of coverage provided by the insolvent members' policies.

¶ 44        There is likewise no merit to the argument that differentiating between primary and excess coverage policies is necessary to prevent employers from attempting to get more than they bargained for and subverting the purposes for which the Fund was created. To the extent an employer receives a price break from his workers' compensation carrier by purchasing an excess coverage policy, it is because the employer is getting less in return. Until the loss retention level is met, the burden of paying the workers' compensation award will be the employer's alone. The insurer will owe nothing. Our construction of the Insurance Code does not change this in any way.

¶ 45        If the insurer under an excess coverage policy becomes insolvent before the loss retention threshold is reached and the policy provisions have therefore not yet been triggered, the Fund will not yet owe anything. The employer will continue to make payments. It is only when the coverage threshold is reached and the excess coverage policy would otherwise have kicked in under the terms of the policy that the Fund's obligation would commence.

¶ 46    Moreover, this obligation is not open-ended. An insured will never receive any more from the Fund than it bargained and paid for through its now-liquidated insurer. It cannot receive more, for the law expressly provides that "[i]n no event shall the Fund be obligated *** in an amount in excess of the face amount of the policy from which the claim arises." 215 ILCS 5/537.2 (West 2010). As a result, the obligations owed by the Fund under the statute as a result of the excess carrier's liquidation will end when the excess carrier's obligation would have ended under the policy it issued to its insured. At that point, the financial burden for addressing the loss will revert back to the insured. Windfalls to insured employers are therefore an impossibility.

¶ 47    Had Home Insurance not become insolvent, there is no dispute that the workers' compensation excess coverage policy it issued to Wells would have required it to continue making payments beyond the $300,000 level. Requiring the Fund to continue making payments under the circumstances present here therefore does nothing more than place Wells in exactly the same position it would have been in had Home Insurance not been subject to an order of liquidation, giving it no more and no less than the benefit of its original bargain and enabling it to avoid what would otherwise be a substantial financial loss, namely, having to pay out of pocket for the same workers' compensation expenses the now worthless Home Insurance policy should have covered. When the General Assembly described the purpose of the law as being "to avoid financial loss to claimants or policyholders because of the entry of an Order of Liquidation against an insolvent company" (215 ILCS 5/532 (West 2010)), this is surely exactly what it had in mind.

¶ 48                                    CONCLUSION

¶ 49    For the foregoing reasons, the circuit and appellate courts were correct when they ruled that the Fund acted improperly when it invoked the $300,000 cap set forth in section 537.2 of the Insurance Code (215 ILCS 5/537.2 (West 2010)) to terminate payments to cover Wells' liability for the amounts still due and unpaid under Soloky's workers' compensation award following liquidation of Wells' workers' compensation carrier. Because the payments at issue are for a covered workers' compensation claim within the meaning of the relevant statutory provisions, the $300,000 statutory cap is inapplicable. The judgment of the appellate court, which affirmed entry of summary judgment in favor of Wells and against the Fund, is therefore affirmed.

¶ 50    Affirmed.

¶ 51    CHIEF JUSTICE KILBRIDE, dissenting:

¶ 52    I respectfully dissent from the majority opinion. The answer to the critical question here, namely, whether the self-insured employer's claim against its insolvent excess-insurance carrier constitutes "any workers compensation claim[ ]," lies not in the transformation of the question or in the use of a more intuitive approach to statutory construction. Instead, the answer is found in the measured application of our traditional rules of statutory construction to the plain language of the Code and the relevant insurance policies.

¶ 53    While the majority's extended discussion of the broad nuts and bolts of the workers' compensation system and the facts underlying the injured worker's receipt of benefits is intellectually enriching, it is not an adequate substitute for the application of our formal approach to statutory construction. Indeed, the majority's detailed discussion, along with statements on the standard of review, the objective of statutory construction, and other issues not in dispute, constitute nearly half of its opinion. The novelty of the majority's approach is evident from the conspicuous absence of the usual indicia of traditional statutory or policy construction.

¶ 54    The proper resolution of this appeal demands a straightforward analysis of the language in the Code and the excess-insurance policies. If Wells' claim, as defined by the policies, falls within the scope of the phrase "any workers compensation claims" as used in section 537.2 of the Code (215 ILCS 5/537.2 (West 2010)), then the Fund's payment obligation is not capped. If it does not, then the Fund properly capped its payments at $300,000. On its face, this court's mission is as simple as that. Yet, the majority opinion doubles down on that simplicity by declining to perform any of the inherently more complex tasks of statutory construction required.

¶ 55    Instead, the majority quickly concludes, only a few pages into its analysis, that the Fund's cap is inapplicable. Its analytical basis to that point boils down to:

          (1) Wells' unpaid claims against Home were "covered claims" under the Act, a fact not disputed by either party;

          (2) those claims arose out of the excess insurance policies issued to Wells to help insure it against workers' compensation liability, a fact the majority deems "indisputable"; followed by

          (3) its conclusion that Wells' claims "qualified as covered workers' compensation claims for purposes of section 537.2," making the Act's $300,000 cap inapplicable. *Supra* ¶ 34.

¶ 56    The majority's conclusion is unaided by consideration of the policy language, instead effectively relying on the summary assertion that the policies "had been purchased to help insure Wells against *liability* for workers' compensation awards." (Emphasis added.) *Supra* ¶ 34.

¶ 57    Moreover, the majority recognizes that an insurer pays benefits on behalf of the insured employer (*supra* ¶ 37), yet it fails to recognize the reason why the insurer makes *any* payments at all, *i.e.*, to fulfill its duties under the terms of the policy. An insurer pays workers' compensation benefits *only because it is contractually liable to the employer to make those payments*. With that in mind, it is easy to understand why the statute "does not differentiate between primary and excess coverage policies" (*supra* ¶ 37): it is because the *language of each policy already dictates the insurer's payment liability* that will be passed along to the Fund. The Code need not distinguish between the two types of policies when each policy's terms already do just that.

¶ 58    Consequently, even though the majority believes it is "indisputable" that Home undertook the contractual duty to help pay Wells' workers' compensation liability (*supra* ¶ 34), that belief is not based on the actual policy language agreed to by the parties. Instead,

-13-

that conclusion arises from the erroneous presumption that the excess insurance policies were intended to fulfill Wells' statutory obligation to pay benefits under the Workers' Compensation Act. *Supra* ¶ 34. Here, the majority is effectively answering the ultimate question pending without the benefit of any linguistic analysis.

¶ 59        If the majority's truncated approach is correct, the opinion could simply end with its intuited statement that Wells' policies are for workers' compensation liability coverage. *Supra* ¶ 34. While the majority appears comfortable in relying on the simplicity of this bare assertion to resolve the instant appeal, I respectfully reject that approach and opt for a more reasoned, traditional one. Although the majority's shorthand may provide a convenient means of avoiding this inherently more complex task, simply declaring that Wells' claims are workers' compensation claims does not make it so. Nothing can replace the tried and true, albeit sometimes arduous, application of our rules of construction. Although the majority's position "is alluring in its simplicity, as applied it fails to adequately give meaning to the intent of the language of the policies at issue and fails to take into account the relationship between a primary and an excess carrier." *Roberts v. Northland Insurance Co.*, 185 Ill. 2d 262, 275 (1998) (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.).

¶ 60        In my view, the key to the resolution of this appeal is the nature of Wells' "covered claim" because section 537.2 limits the Fund's payment obligation to $300,000 "except that this limitation shall not apply to any *workers compensation claims*." (Emphasis added.) 215 ILCS 5/537.2 (West 2010). To determine whether the cap applies, the court must carefully examine two critical components, the statutory language adopted by the legislature and the policy language agreed to by the parties. That crucial language, however, makes only incidental appearances in the majority's discussion. That same language provides the focus for my dissent.

¶ 61        As the majority correctly notes, it is undisputed that Wells' claim is a "covered claim." *Supra* ¶ 34. The plain language of the Code bears out that conclusion. A "covered claim" is defined in relevant part as:

> "*an unpaid claim for a loss arising out of and within the coverage of an insurance policy* to which this Article applies and which is in force at the time of the occurrence giving rise to the unpaid claim, *** *made by a person insured under such policy* ***[.]*" (Emphases added.) 215 ILCS 5/534.3 (West 2010).

Here, Wells has presented a "covered claim" because it is "an unpaid claim" filed by Wells, an Illinois resident and "insured person" under its policies with Home, an insurance company that became insolvent. See 215 ILCS 5/534.3 (West 2010).

¶ 62        In turn, the determination of whether Wells' covered claim is also a workers' compensation claim within the meaning of the statutory exception to the Fund's $300,000 payment cap relies on the interaction between Code sections 537.2 and 534.3. In relevant part, section 537.2 states:

> "The Fund shall be obligated to the extent of the *covered claims* existing prior to the entry of an Order of Liquidation against an insolvent company *** and if the entry of an Order of Liquidation occurs on or after January 1, 1988 and before January 1,

2011, such obligations shall not: (i) exceed $300,000, except that this limitation *shall not apply to any workers compensation claims* \*\*\*." (Emphases added.) 215 ILCS 5/537.2 (West 2010).

¶ 63 Despite the focus of this case necessarily being the nature of Wells' "claim," the majority chooses instead to shift its focus to the "coverage" Wells allegedly purchased and away from the actual "claim" it is making. *Supra* ¶¶ 36-43. By straying from the precise language in the statute and declining to review the policy terms, the majority inadvertently distorts the question before this court and ignores the significance of the legislature's key word: "claim."

¶ 64 Looked at as a whole, this case loosely involves two distinct "claims." The first is the injured worker's claim for compensation awarded against Wells, her former employer. That claim is based strictly on Wells' statutory liability under the Act. The second is Wells' claim under its insurance policies with Home; that claim is premised solely on Home's breach of its duty under those policies after its insolvency.

¶ 65 By definition, the injured worker's original claim against Wells is a workers' compensation claim. That, however, is clearly *not* the claim at issue in this case. To constitute a "covered claim," Wells' "loss" must be "arising out of and within the coverage of an insurance policy to which this Article applies." Here, the injured worker's claim against Wells is purely statutory and does not arise out of any insurance policy. The only "unpaid claim" raised must be "for a loss arising out of and within" the excess-insurance policies issued to Wells, "a person insured under such polic[ies]," by Home. See 215 ILCS 5/534.3 (West 2010) (defining a "covered claim"). Thus, the only possible "covered claim" is Wells' contractual insurance claim against Home.

¶ 66 Once Home became insolvent, section 537.4 of the Code defined the Fund's obligation to undertake its responsibilities, stating that the Fund "shall be deemed the insolvent company \*\*\* and \*\*\* *shall have all rights, duties, and obligations of the insolvent company* \*\*\* as if the company had not become insolvent." (Emphasis added.) 215 ILCS 5/537.4 (West 2010). Thus, that section limits the Fund's duties to the *contractual responsibilities Homes bore under its policies*, making Wells' "claims" against the Fund the same contractual "claims" it possessed against Home.

¶ 67 The next step is to identify the fundamental nature of Wells' "claims." That step necessitates a close examination of the policy language that created Home's payment obligations. If that language shows the policies were intended to satisfy Wells' statutory liability for its injured employee's award, then Wells' claims would be "workers compensation claims," as the majority concluded. If it does not reveal that intent, the majority's conclusion necessarily fails.

¶ 68 Courts must construe language in an insurance policy *de novo* and apply that language as written unless it contravenes public policy. *Roberts*, 185 Ill. 2d at 266. The majority's approach bypasses any review of the relevant policy language and simply concludes that Wells' claim is a workers' compensation claim because its excess insurance policies were essentially liability policies, with any differences arising merely in their "mechanics." *Supra* ¶¶ 34, 37.

¶ 69 I roundly disagree with the majority's decision to equate Wells' excess-insurance policies

with a workers' compensation claim. The excess-insurance policies, however, do not affect Wells' "liability" for workers' compensation benefits; that liability is set by the Act and cannot be the basis for Wells' covered claim *unless* Home contractually assumed that duty under a *bono fide* liability coverage policy. See *supra* ¶ 37 (recognizing that the legal liability for paying benefits here remains unchanged). Thus, unlike the majority, I believe a review of the policy language is critical here. Before my analysis of Home's duties under the policy language, however, a review of the intrinsic differences between claims brought pursuant to primary liability and excess insurance policies is useful.

¶ 70    Primary insurance "is insurance coverage in which, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability." 44A Am. Jur. 2d *Insurance* § 1755 (2003). In contrast, "[e]xcess or secondary coverage *** is coverage in which, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." 44A Am. Jur. 2d *Insurance* § 1755 (2003). Excess insurance provides protection against catastrophic loss and is intended to apply only when high levels of liability are present, greatly reducing the excess insurer's risk.

¶ 71    This court has previously stated that primary liability insurance, or self-insurance, is inherently different from the excess-insurance coverage bargained for by the parties here. *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 116 (2007) (relying on "the clear distinctions between primary and excess insurance coverage"). In *Roberts*, Justice Freeman explained that excess insurance offers a *secondary* level of protection that "attaches only *after* a predetermined amount of primary insurance or self-insured retention has been exhausted." (Emphasis added.) (Internal quotation marks omitted.) *Kajima*, 227 Ill. 2d at 114-15 (quoting *Roberts*, 185 Ill. 2d at 277 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.), quoting Scott M. Seaman & Charlene Kittredge, *Excess Liability Insurance: Law and Litigation*, 32 Tort & Ins. L.J. 653, 656 (Spring 1997)). Subsequently, in *Kajima*, this court unanimously found "Justice Freeman's separate writing in *Roberts* *** to be particularly instructive." *Kajima*, 227 Ill. 2d at 114.

¶ 72    Accordingly, if Wells had purchased workers' compensation *liability* coverage from Home, as the majority asserts (*supra* ¶ 34), Home would have been contractually responsible for making benefit payments to satisfy Wells' statutory liability under the Act. See 44A Am. Jur. 2d *Insurance* § 1755 (2003) (explaining that primary insurance "is insurance coverage in which, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability"). See also *In re Claim of National Union Fire Insurance Co. of Pittsburgh, PA for Benefits From the New Jersey Worker's Compensation Security Fund*, 2008 WL 516290, at *4 (N.J. Super. Ct. App. Div. Feb. 29, 2008) (*per curiam*) (concluding that an excess-insurance policy is "not a primary workers' compensation insurance policy, designed for payment to injured employees"); *Oneida Ltd. v. Utica Mutual Insurance Co.*, 694 N.Y.S.2d 221, 224 (N.Y. App. Div. 1999) (recognizing that an excess-insurance policy " 'is not considered to be workers' compensation insurance since *** no statutory workers' compensation benefits are paid directly to an injured employee under the excess policy' "). Under that scenario, once Home was liquidated, the Fund would have taken over Home's payment duties, in essence becoming an alternate payor for Home's

contractual obligation to satisfy Wells' statutory liability. See 215 ILCS 5/537.4 (West 2010) (imposing on the Fund "all rights, duties, and obligations of the insolvent company *** as if the company had not become insolvent"). Consequently, Home's contractual payment responsibility would have brought Wells' claim against the Fund within the scope of the phrase "any workers compensation claims" in section 537.2, and the Fund's $300,000 payment cap would not apply.

¶ 73        The language in both Wells' insurance policies, however, definitively establishes that they were not intended to provide either primary or workers' compensation liability coverage. Both policies contain provisions making them inapplicable to payments "arising out of the operations *** as respects which the Insured carries a full coverage Workers' Compensation *** policy." Thus, the policies would not apply if Wells had insurance for its workers' compensation liability, establishing that the two policies were intended to serve as "excess-only." Tellingly, both policies are also conditioned on Wells being "qualified" or "authorized" as a *self-insure*r and its continuation of that status. Obviously, it would be antithetical for a qualified self-insurer to have primary liability insurance coverage. Therefore, the policy language rebuts the majority's "indisputable" conclusion that the policies were intended to provide Wells with workers' compensation liability coverage (*supra* ¶ 34). To the contrary, by making the business decision to self-insure, Wells voluntarily assumed the role of providing its own equivalent first-line workers' compensation liability coverage.

¶ 74        In an attempt to reduce its out-of-pocket expenses, however, Wells contracted with Home to provide excess-insurance coverage. Wells' only "covered claim" is based exclusively on those excess-insurance policies. See 215 ILCS 5/534.3 (West 2010) (requiring a "covered claim" to be for "a loss arising out of and within the coverage" of the policies issued by a defunct insurer). Under its excess-only policies, Home's contractual duty to Wells was considerably different than it would have been under a liability insurance policy. Contrary to the majority's assertion (*supra* ¶ 37), however, this court has expressly recognized that the difference in those contractual duties is one of substance, not mere mechanics. In *Kajima*, 227 Ill. 2d at 116, we found "clear distinctions between primary and excess insurance coverage," contradicting the majority's position in this case. While "the primary policy provides 'first dollar' liability coverage up to the limits of the policy," giving the primary insurer contractual first-line responsibility for making benefit payments, excess insurance " 'attaches only after a predetermined amount of primary insurance or self-insured retention has been exhausted.' " *Roberts*, 185 Ill. 2d at 276-77 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.) (quoting Scott M. Seaman & Charlene Kittredge, *Excess Liability Insurance: Law and Litigation*, 32 Tort & Ins. L.J. 653, 656 (Spring 1997)); see *Kajima*, 227 Ill. 2d at 114-15.

¶ 75        Turning back to the language in Wells' excess-insurance policies, I note that although the exact language differs somewhat, the effect is the same. The parties' "Aggregate Excess Workers' Compensation and Employers' Liability Policy" was designed "[t]o *indemnify* the Insured [Wells] for payment, as hereinafter defined, in excess of the 'Insured's Retention.' " (Emphasis added.) The policy defines "payment" as "the amount *the insured shall have actually paid*: *** for compensation and other benefits *required of the Insured* by the

-17-

workers' compensation law." (Emphases added.) Thus, in the aggregate excess-insurance policy, the parties agreed that Home would only "indemnify" Wells for amounts over its retention limit that it "actually paid" as "required of [it as] the Insured" by the Act.

¶ 76 Similarly, in Wells' "Specific Excess Workers' Compensation and Employers' Liability Policy," Home "agree[d] to *indemnify* the Insured [Wells] against excess loss, *** which the Insured may sustain on account of: (a) compensation and other benefits *required of the Insured* by the Workers' Compensation Law." (Emphases added.) Home's "Limit of Liability" for indemnification is "only for the *ultimate net loss* in excess of *** the 'retained limit(s)' " of $200,000. (Emphasis added.) The term "ultimate net loss" is defined in the policy as "the sum *actually paid* in cash in the settlement or satisfaction of losses for which the Insured is liable." (Emphasis added.) Summarizing the parties' expressed intentions in the specific excess-insurance policy, Home was only obliged to "indemnify" Wells for amounts over its retention limit that Wells "actually paid" "on account of: (a) compensation and other benefits *required of the Insured* by the Workers' Compensation Law." (Emphasis added.)

¶ 77 According to the parties' contractual agreement, Wells had to submit a periodic "statement from or on behalf of the Insured showing each payment made by the Insured during such period in excess of the Insured's Retention," before Home would "promptly reimburse the insured for such indemnification as the company is obligated to pay under the terms of this policy." The fact that Home previously used the services of a third-party administrator as a matter of convenience to make the required payments does not change the nature of its underlying contractual duty. See *supra* ¶ 10.

¶ 78 In summary, the policy language makes it indisputably clear that Home *never* agreed to assume responsibility for paying the workers' compensation benefits owed by Wells. In turn, section 537.4 compels the Fund to undertake only *Home's contractual duties* and obligations under its excess-insurance policies. Thus, *the Fund's duty is limited to the contractual indemnification obligation Home undertook* in providing the excess insurance. Simply put, the *Fund's duty* is not to pay Wells' workers' compensation liability for it because *Home never undertook that obligation*. Instead, the policies limited Home's responsibility to indemnifying Wells for benefits it has already paid out-of-pocket. The contractual duty that was passed to the Fund was necessarily defined solely by those same policy terms. A limited contractual duty to make reimbursement for payments actually made by an insured cannot transform Wells' "covered claim" into a "workers' compensation claim." The majority's contrary conclusion is simply not supported by any language in the insurance policies.

¶ 79 Furthermore, the critical connection between the Fund's duties and the type of insurance purchased by Wells is underscored by the role available to the injured worker in the instant litigation, a factor not addressed by the majority. If Wells' covered claim were in fact a workers' compensation liability claim, the worker would have had a vital interest in the outcome of the case because her continued receipt of benefits would be implicated. Accordingly, she would have standing to participate in this case. The injured worker here, however, indisputably will continue to receive her workers' compensation benefits regardless of the party that prevails, demonstrating that she has no interest in the outcome in this matter and lacks standing to participate. Indeed, no party has even suggested that the injured worker

-18-

could *ever* seek recovery from the Fund, and she has never been involved in this litigation. The injured worker's clear inability to participate in this case or to demand payment from the Fund at any point further proves that Wells' "covered claim" is not based on workers' compensation "liability" coverage it acquired from Home, as the majority posits.

¶ 80    The majority's view of section 537.2 would effectively allow Wells to shift its exclusive statutory burden of paying benefits to the Fund by relying on its indemnity policies with Home. But, the policy language shows the parties never intended Home to assume Wells' payment obligation, as it would have done under a true workers' compensation liability policy. Moreover, if the majority's assertion that the difference between undertaking the burden of paying an employer's workers' compensation liability and reimbursing an employer who has already fulfilled that statutory duty "is one of mechanics, not substance" is accurate, a serious question is raised about why the insurance industry found it necessary to create two types of insurance. See *supra* ¶ 37. Logically, if the two types of policies differed *only* in their "mechanics," insurers would have had no incentive to go to the expense of creating, marketing, and administering excess-insurance policies. They simply could have sold liability policies. Moreover, if the two types of policies are essentially the same, as the majority claims, this court's contrary statement in *Kajima* must be incorrect. *Kajima*, 227 Ill. 2d at 116 (explaining "the clear distinctions between primary and excess insurance coverage"). In an attempt to add support to its conclusion, the majority also correctly notes that "it is always the employer who has purchased the coverage" (*supra* ¶ 37), but this truism is merely a red herring. The identity of the policies' purchaser is irrelevant to our analysis; the nature of the insured's *claim* is the critical factor.

¶ 81    Here, after considering the available alternatives, Wells voluntarily chose *not* to purchase workers' compensation liability coverage that would have obliged the Fund to act as a substitute payor for the unpaid workers' compensation claims remaining after Home was liquidated. Consequently, neither Home nor the Fund become an alternate payor for Wells' statutory liability under the terms of the policies it purchased. Because Wells' original claim against Home was for indemnification, not workers' compensation, the claim it now has against the Fund is also only for indemnification and is not "any workers compensation claim[ ]," capping the Fund's payment obligation at $300,000. See 215 ILCS 5/537.2 (West 2010).

¶ 82    The majority's holding that Wells' policy claim constitutes a workers' compensation claim for purposes of section 537.2 blurs the clear distinction this court previously recognized between self-insured employers that obtain excess coverage and employers that specifically seek out primary workers' compensation liability coverage. *Kajima*, 227 Ill. 2d at 116 (refusing to "eviscerate" the "clear distinctions between primary and excess insurance coverage"). By opting for primary liability coverage, employers choose to eliminate their obligation to pay any workers' compensation awards out-of-pocket after satisfying their deductible. In exchange for that enhanced benefit, they agree to pay substantially higher insurance premiums. Primary liability carriers charge higher premiums than excess-insurance carriers because the former accept greater risk. *Roberts*, 185 Ill. 2d at 271. " '[E]xcess premiums are lower because excess coverage is, by its very nature, not supposed to be triggered until the underlying policy has been exhausted up to its limits.' " *Kajima*, 227 Ill.

2d at 116 (quoting *Roberts*, 185 Ill. 2d at 281 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.)).

¶ 83 On the other hand, employers may make the business decision either to go without any insurance coverage, thus bearing the full burden of paying all workers' compensation claims out-of-pocket, or, like Wells, to pay all benefits out-of-pocket up to their high retention limit and purchase far cheaper excess-insurance with indemnity-only coverage to address their potential catastrophic liability. Scott M. Seaman & Charlene Kittredge, *Excess Liability Insurance: Law and Litigation*, 32 Tort & Ins. L.J. 653, 656-57 (Spring 1997). The lower risk undertaken by the insurer's risk is similarly reflected in its lower excess-insurance premiums. 44A Am. Jur. 2d *Insurance* § 1755 (2003). Even though the sparse record on summary judgment in this case does not contain a cost comparison, the parties confirmed during oral arguments before this court that excess insurance premiums paid by self-insured parties are generally substantially lower than primary insurance policy premiums, a fact ignored by the majority.

¶ 84 Under the majority's construction of the Code, self-insured employers purchasing excess insurance providing only indemnification would receive benefits identical to those received by employers paying much higher premiums for expensive primary liability coverage that contractually off-loads their ultimate out-of-pocket payment responsibility. That benefit, of course, is on top of the significant financial advantage self-insured employers initially receive from paying far lower insurance premiums. Such an outcome would create a perverse incentive by encouraging employers to eschew primary liability coverage whenever possible, while obtaining the same limits on its out-of-pocket payments by buying far cheaper excess-only policies.

¶ 85 By effectively acting as their own primary insurers, however, self-insurers such as Wells voluntarily choose to undertake a far greater risk of out-of-pocket loss than do employers that rely on primary liability coverage from an outside source. If Wells could limit its total out-of-pocket exposure by obtaining far less expensive indemnity-only insurance and then relying on the Fund for reimbursement beyond the applicable cap, the greater risk it assumed as a self-insurer would be untethered from the premiums it paid.

¶ 86 Curiously, Justice Freeman has chosen to depart in this case from his strong advocacy in *Roberts* for basing parties' ultimate workers' compensation liability on the differential degree of risk intentionally undertaken by the first-line and excess insurers. *Roberts*, 185 Ill. 2d at 279 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.). In *Roberts*, Justice Freeman correctly recognized that policy interpretations should "give[ ] full effect to the level of risk each carrier intended to expose itself to" and noted that placing a heavier payment burden on the excess insurer, or the Fund as Home's surrogate, rather than on the first-line insurer "turns the concept of excess coverage on its head." *Roberts*, 185 Ill. 2d at 280, 282 (Freeman, C.J., concurring in part and dissenting in part, joined by Miller and McMorrow, JJ.). See also *Kajima*, 227 Ill. 2d at 114 (finding "Justice Freeman's separate writing in *Roberts*" to be "particularly instructive").

¶ 87 Despite this court's prior approval of allocating employers' liability for benefit payments according to the differing degrees of risk undertaken by first-line insurers, such as Wells, and

excess insurers, the majority suggests that the Fund's proposed construction of section 537.2 yields absurd or unjust results. *Supra* ¶ 39. For example, the majority believes it is absurd for the Act to provide differing coverage for "identical employers [that] purchase insurance policies from the identical insurer to help cover the same type of loss—workers' compensation obligations—above the identical loss threshold." *Supra* ¶ 39. If the two employers and policies were truly identical, I would agree. But, if one employer has chosen to protect against out-of-pocket losses by buying a true workers' compensation liability policy while another has chosen to become self-insured, effectively becoming its own first-line liability insurer, and purchasing only excess coverage to reimburse it for payments it has made, as here, then the two scenarios are simply not identical. The employers have each made the rational business decision that best fits their company's individual circumstances after taking into account the relevant variables, such as the differences in coverage.

¶ 88    The majority's error derives from its decision to ignore inherent differences in the actual terms of the insurance policies obtained by its two hypothetically "identical employers." If Employer 1 obtained a primary liability policy, then it contractually transferred the responsibility for making direct payments to its injured workers to its liability insurer. If, however, as here, Employer 2 chose to be self-insured and purchased an excess-only policy, then its insurer merely agreed to reimburse it for payments it had already made. In Employer 2's case, the excess insurer does not contractually undertake the primary payment responsibility for an injured worker's benefits.

¶ 89    It cannot be overstated that the Fund assumes *only* those duties and obligations owed by the insolvent insurer under the specific policy purchased. 215 ILCS 5/537.4 (West 2010). If the insurer did not bear the responsibility for paying workers' compensation benefits, the Fund does not either. The protection the legislature afforded to each employer is dependent not on the majority's generalized concept of "fairness" but on the specific coverage provided by the particular policy. See 215 ILCS 5/534.3 (West 2010) (defining a "covered claim" as one "arising out of and within the coverage of an insurance policy").

¶ 90    The conclusion reached by the majority would also likely create more demand for cheaper excess-only coverage, placing a greater potential burden on the Fund's resources. To pay out more, the Fund would have to increase the annual assessments paid by insurance companies that finance it. See 215 ILCS 5/537.6 (West 2010) (explaining the Fund's assessment and funding processes). Increases in those assessments would, in turn, be passed along to insureds as higher premiums, raising the cost of excess insurance.

¶ 91    In addition, the majority erroneously asserts that "[t]here is no basis whatever for concern that [relying on members' assessments to finance unlimited payments to the insureds of insolvent companies] will place an undue burden on the Fund's resources." *Supra* ¶ 43. But, in a point quickly glossed over by the majority (*supra* ¶ 43), the maximum amount of each assessment is statutorily limited to

> "2% of [each] member company's net direct written premium *** for the calendar year preceding the assessment. *** If the maximum assessment, together with the [Fund's] other assets ***, does not provide, in any one year, *** an amount sufficient to make all necessary payments ***[,] *the unpaid portion shall be paid as soon*

*thereafter as funds become available.*" (Emphasis added.) 215 ILCS 5/537.6 (West 2010).

¶ 92    The 2% limit on assessments provides all the "basis" needed to support my conclusion. As the number of self-insured employers relying on excess-only insurance policies who seek payments from the Fund beyond the applicable caps expands, the Fund's long-term payment obligations could readily outstrip its ability to replenish its resources under the 2% assessment limit. Indeed, even the majority admits that the assessment limit may create significant delays in the Fund's distribution of payments. While the majority attempts to minimize this consequence with the assurance that the Fund "will *ultimately* recover any and all amounts it must pay out *** to meet the obligations of its insolvent members" (emphasis added) (*supra* ¶ 43), its explanation ignores the very real impact payment delays would have on injured workers' receipt of what it deems to be workers' compensation liability payments.

¶ 93    If the Fund's payments are indeed for Wells' workers' compensation liability, as the majority claims, delays in those payments are contrary to the legislative purposes of both the Fund and the Illinois Workers' Compensation Act. "[T]he fundamental purpose of the Act *** was to afford protection to employees by providing them with *prompt and equitable compensation* for their injuries." (Emphasis added.) (Internal quotation marks omitted.) *McNamee v. Federated Equipment & Supply Co.*, 181 Ill. 2d 415, 421 (1998) (quoting *Mitsuuchi v. City of Chicago*, 125 Ill. 2d 489, 494 (1988), quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 180-81 (1978)). Moreover, the legislative impetus behind the Fund was "to avoid excessive delay in payment" of covered claims. 215 ILCS 5/532 (West 2010). The view adopted by Wells and the majority contravenes the stated purposes of both the Code section creating the Fund and the Workers' Compensation Act. Accordingly, the majority's construction of section 537.2 violates the fundamental principle that courts must construe statutes to give effect to the stated intent of the legislature, not to contradict it. *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 275 (2009).

¶ 94    Nonetheless, the majority maintains that its disposition is surely "exactly what [the legislature] had in mind" when it expressed the Guaranty Fund Act's stated purpose as "to avoid financial loss to claimants or policyholders" when an insurer becomes insolvent (215 ILCS 5/532 (West 2010)). *Supra* ¶ 47. The statutory language also shows, however, that the Act's protection was never designed to be all-inclusive. See *Exelon*, 234 Ill. 2d at 275 (explaining that construction of statutes should be consistent with their stated legislative purpose). The plain language of section 537.2 shows that in the vast majority of circumstances the Fund is obliged to protect claimants and policyholders only up to the payment cap created by the state legislature, here $300,000. Claimants and policyholders still incur all additional losses. Moreover, section 537.4 specifically obliges the Fund only to fulfill the insolvent insurer's duties "*subject to the limitations provided in this Article.*" (Emphasis added.) 215 ILCS 5/537.4 (West 2010). This phrase expressly caps the Fund's obligations at the amounts adopted by the legislature in section 537.2, here $300,000. The majority states that "[r]equiring the Fund to continue making payments *** here therefore does nothing more than place Wells in exactly the same position it would have been in *** and enabling it to avoid what would otherwise be a substantial financial loss, namely, having to pay out of pocket for the same workers' compensation expenses the now worthless Home

Insurance policy should have covered" was the legislature's intent. *Supra* ¶ 47. That statement is true, however, only if the excess coverage policy that Wells *actually purchased* is transformed into a primary workers compensation liability policy *that it already declined to buy*. The majority's justification fails to support its interpretation of the Act; in fact, its interpretation has to be assumed to support its justification. Contrary to its declaration that this court cannot "depart from the plain language of the law and read into it exceptions, limitations or conditions which the legislature did not express" (*supra* ¶ 38), that is exactly what the majority is doing. The majority's approach ignores the language specifically chosen by the legislature for the payment cap exception ("any workers compensation *claims*" (emphasis added)) that would require this court to look to the policy language to determine the true nature of Wells' claim.

¶ 95    The legislature's rationale for creating a single exception to the payment caps for workers' compensation claims is readily apparent. 215 ILCS 5/537.2 (West 2010). As previously noted, the Workers' Compensation Act's purpose is to protect workers injured in the workplace "by providing them with prompt and equitable compensation for their injuries." (Internal quotation marks omitted.) *McNamee*, 181 Ill. 2d at 421 (quoting *Mitsuuchi v. City of Chicago*, 125 Ill. 2d 489, 494 (1988), quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 180-81 (1978)). Once the policy language is actually examined, it is apparent that Wells' covered claim is not a workers' compensation claim. Accordingly, my proposed outcome is consistent with the legislature's intent to cap the Fund's other payment obligations, as well as with the overall purpose of the Guaranty Fund and the plain language of sections 537.2 and 537.4. Under this construction, Wells' injured worker will continue to be afforded full protection and will receive her payments in a timely manner. Any delays in receiving money from the Fund will be limited to Wells' reimbursement payments, not the workers' compensation benefits being paid to Wells' seriously injured worker. 215 ILCS 5/537.6 (West 2010) (stating "If the maximum assessment, together with the [Fund's] other assets ***, does not provide, in any one year, *** an amount sufficient to make all necessary payments ***[,] *the unpaid portion shall be paid as soon thereafter as funds become available*" (emphasis added)). Under the majority's rationale, the burden of the delay would be imposed solely on the injured benefit recipient, contrary to the legislature's stated intent.

¶ 96    The legislature did not, however, express a similar intent to provide comprehensive protection to self-insured employers such as Wells. Employers alone can control their potential out-of-pocket risks based on the reasonable consequences of their rational business decisions about the type of insurance coverage necessary to meet their needs and goals. Accordingly, my construction is completely consistent with the legislative purpose of section 537.2. See *Exelon*, 234 Ill. 2d at 275 (requiring courts to effectuate the legislature's intent by examining the plain, ordinary, and unambiguous language of the statutes, taken as a whole).

¶ 97    Although the majority also suggests that employers who purchase primary coverage are not treated unfairly by its interpretation of section 537.2, its supporting assertion that "[i]t is only when the coverage threshold is reached *** that the Fund's obligation would *commence*" (emphasis added) (*supra* ¶ 45) misses the point. This case is not about employers who buy indemnification-only coverage obtaining an unfair benefit by receiving *earlier*

payments from the Fund. It is about the legislature's statutory restriction on the *total amount* employers may receive from the Fund, regardless of when those payments begin. It is the end of the Fund's obligation, not its beginning, that is at issue.

¶ 98     The majority also maintains that "[w]indfalls to insured employers are *** an impossibility" because the Fund's payment obligation is coextensive with that of the policy. *Supra* ¶ 46. Obviously, the Fund would never pay more than the policy requires. The legislature, however, specifically drafted section 537.2 to require the Fund to pay the *lesser* of the sums due under the policy or the cap, except when the claim is for a workers' compensation claim. 215 ILCS 5/537.2 (West 2010). If the legislature had intended the Fund to pay the full benefits due under every type of policy, it would not have included *any* payment caps in section 537.2 (215 ILCS 5/537.2 (West 2010)). The policy limits themselves would have provided all the caps needed. Once again, the majority's point is only apropo if Wells' covered claim is presumed to be a workers' compensation claim. Making that presumption, however, overlooks the actual language used in the applicable statutes and the underlying excess-insurance policies.

¶ 99     After carefully reviewing the relevant statutory provisions, the intent of the legislature, and the applicable policy language under this court's traditional rules of statutory construction, I am compelled to conclude legislative exception to the Fund's payment cap for workers' compensation claims does not apply to Wells' indemnification claim against its defunct insurer. Accordingly, the Fund was obliged to make payments only up to its $300,000 statutory cap. It has fulfilled that obligation, leaving Wells responsible for making its injured employee's remaining workers' compensation benefits without reimbursement.

¶ 100     If Wells should become insolvent, or is otherwise unable to continue those payments, Wells' injured worker is still assured of receiving her full workers' compensation award. The Self-Insurers Advisory Board (SIAB), created in the Workers' Compensation Act to administer and pay claims against insolvent self-insured employers, would become responsible for the continuation of her benefit payments. 820 ILCS 305/4a-1, 4a-6 (West 2010) (creating the SIAB and obliging it to "assume *** the outstanding workers' compensation *** obligations of the insolvent self-insured"). Because I would reverse the appellate court's judgment and remand the cause to the circuit court for entry of summary judgment in favor of the Fund, I must respectfully dissent from the majority opinion.

¶ 101     JUSTICE THOMAS, dissenting:

¶ 102     Like Chief Justice Kilbride, I am convinced that the claims at issue in this case are not "workers compensation claims," as that term is used in section 537.2 of the Code (215 ILCS 5/537.2 (West 2010)). Accordingly, I respectfully dissent.

¶ 103     Clearly, the public policy purpose of the "workers compensation claims" exception to the $300,000 statutory cap is to ensure that an injured worker receives all of the benefits to which he or she is entitled in the event that the employer's workers' compensation insurer becomes insolvent. Yet I simply cannot see how that public policy purpose is implicated in this case.

¶ 104     In the typical case of workers' compensation liability coverage, the insurer agrees to pay

when due the benefits required of the employer by the workers' compensation law. In other words, with liability coverage, the insurer legally assumes the employer's obligation to pay the injured employee's benefits. Indeed, the Workers' Compensation Act contemplates this very arrangement when it specifically authorizes an employer to "[i]nsure his entire liability to pay such compensation." 820 ILCS 305/4(a)(3) (West 2010). Under these circumstances, if the insurer becomes insolvent, the employee's benefits will not be paid, as the insolvent insurer has assumed the legal obligation to pay them directly. *This* is the situation for which the exception to the statutory cap exists.

¶ 105        In our case, by contrast, the policy involved is not one of *liability* in which Home legally assumed Wells' obligation to pay its employees' workers' compensation benefits. Rather, the policy involved is one for *indemnification*, in which Home agreed only to reimburse Wells for workers' compensation benefits it "actually paid," once those benefits reached a certain amount. In other words, Wells, as the employer, has *legally retained* sole responsibility for paying its injured employee's claims. And this distinction is crucial because, unlike a case involving workers' compensation *liability* coverage, Home's insolvency in our case would have no bearing on whether the injured employee is in fact paid. Again, Wells contracted only for reimbursement of payments *actually made*. This means that, to the extent that Wells is seeking indemnification from Home, the injured employee's benefits *have to have already been paid*. Conversely, if at any point Wells *stops* paying its injured employee's benefits, for whatever reason, Wells would have no claim against Home because, again, that policy only provides reimbursement for payments *that have already been made*. No payment, no reimbursement. Either way, whatever arrangement Wells has with Home is completely divorced from and therefore has no bearing on whether the injured employee is actually paid.

¶ 106        In other words, the crucial distinction in this case is not between *primary* and *excess* coverage but between *liability* and *indemnification* coverage. This is because under *any* liability policy, be it primary or excess, the insurer legally assumes the employer's obligation to pay the injured employee's benefits. A primary liability policy simply means that the insurer assumes that legal obligation earlier than under an excess liability policy. Consequently, if a *liability* carrier becomes insolvent, be it a primary or an excess, the workers' compensation claims that the carrier has assumed legal responsibility for paying *will not be paid*. By contrast, the insolvency of an indemnification carrier will *never* affect whether an injured employee's benefits are in fact paid because an indemnification carrier only *reimburses* a responsible employer for claims *that the employer has already paid*.

¶ 107        And again, this case involves an *indemnification* policy, not a *liability* policy. Consequently, the public policy that I am convinced informs the "workers compensation claims" exception to the $300,000 statutory cap—to ensure that injured employees continue to be paid despite a workers' compensation insurer's insolvency—simply is not present in this case. Consequently, I am hard-pressed to characterize the claims at issue as "workers compensation claims" rather than as what they patently are—claims for reimbursement of workers' compensation claims that have already been paid.

¶ 108        Accordingly, I respectfully dissent.